68 F.2d 859 (1934)
In re NATIONAL PUBLIC SERVICE CORPORATION.
UTILITIES POWER & LIGHT CORPORATION et al.
v.
IRVING TRUST CO.
Nos. 134, 275.
Circuit Court of Appeals, Second Circuit.
January 15, 1934.
Wollman & Wollman and Robert G. Starr, all of New York City (Henry Wollman, Robert G. Starr and Edward S. Seidman, all of New York City, of counsel), for appellant Utilities Power & Light Corporation.
Hornblower, Miller, Miller & Boston, of New York City (Claude M. Terrell, of New York City, of counsel), for appellant Mary A. Walsh.
Cotton, Franklin, Wright & Gordon, of New York City (Edward L. Williams, Boykin C. Wright, Paxton Blair, Aldis H. Wurts, and Fredrick M. Eaton, all of New York City, of counsel), for appellee Irving Trust Co.
Wing, Lakin, Russell & Whedon, of New York City, for National Public Service Corporation Debenture Committee.
Sullivan & Cromwell, of New York City, for National Electric Power Corporation Debenture Committee.
Milbank, Tweed, Hope & Webb, of New York City, for Chase Nat. Bank of City of New York, Virginia Public Service Co., and Eastern Shore Public Service Co.
Tracy, Chapman & Welles, of Toledo, Ohio, for Central Utilities Service Co., Central Eastern Power Co., and Municipal Service Co.
John D. Harris, of St. Petersburg, Fla., for Florida Power Corporation and Tide Water Power Co.
English, Quinn, Leemhuis & Tayntor, of Erie, Pa., for Penn Central Light & Power Co.
Zalkin & Cohen, of New York City, for Western Reserve Power & Light Co.
Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.
*860 L. HAND, Circuit Judge.
The bankrupt was one of a series of holding and operating companies closely interwoven in interest, and collectively engaged in furnishing electric power and light to cities in the eastern part of the United States. The National Electric Power Company, another of the series, was the final holding company, owning, along with shares in other subsidiaries, 96 per cent. of the shares of the bankrupt. The Seaboard Public Service Company was in the same relation to the bankrupt, as the bankrupt to the National Electric Power Company; the bankrupt held 99 per cent. of its voting shares. The shares of a fourth company, the Electric Management & Engineering Corporation, were owned half and half by the bankrupt and National Electric Power Company. These companies had borrowed from and lent to each other; they had used each other's property, especially in the form of shares in subsidiaries, as collaterals for their loans, and the legal relations between them had become extremely difficult to disentangle. All four became bankrupt in July, 1932, and the Irving Trust Company was appointed trustee of each in August of that year; it retained the same attorneys in each proceeding. At the election the appellant Utilities Power & Light Company was present by counsel, though it is not clear whether or not it voted for the trustee; certainly it voted for no other candidate and no other was suggested. Soon after the election, however, it complained to the trustee and to its attorneys, because of their common representation of all four bankrupts and asked them to resign, but they refused. As is customary in such cases, numbers of creditors formed committees, which took part in numerous conferences with the trustee, and shared in the negotiations that ended in the disputed compromise; at no time did any committee or any creditor object to a common trustee for all the bankrupts. The Utilities Power & Light Company, having failed to persuade the trustee and its attorneys to resign, made no effort to bring the matter before the court, but on the other hand took an active part in some twenty-five different plans of reorganization, which were suggested by or to the creditors, and were under consideration until the beginning of the year. All broke down, principally because of five bank loans secured by collateral belonging to the bankrupts. After the beginning of the year 1933, two of the banks still refrained from closing out their loans, but they were becoming very restive; of the other three one had sold out its whole security, and the fourth was already in process of doing so; the fifth was tied up in litigation. It was plain that some sort of immediate settlement was necessary if any salvage was to be made. The trustee's attorneys, abandoning any hope of reorganization, turned their attention to an accommodation with these two banks, and after much labor and negotiation a provisional settlement was reached with them and the various creditors' committees of all four companies. On April 1, 1933, the Irving Trust Company as trustee for the four bankrupts presented a petition to the bankruptcy court, asking leave under section 27, Bankr. Act (11 USCA § 50), to compromise the claims of the banks and all intercorporate claims that grew out of them.
The background of this settlement was as follows: One of the banks, the New York Trust Company, held two notes, of which the bankrupt was maker, and the National Electric Power Company indorser. The larger of these was principally secured by two notes of the Seaboard Public Service Company to the National Electric Power Company, indorsed by the latter, in their turn secured by shares of subsidiaries which belonged to the Seaboard Public Service Company. The note in chief was also secured by preferred shares and bonds of certain traction companies, the only property of the bankrupt pledged as collateral or involved in the compromise. These last had a face value of $2,600,000, but as all the traction companies were in receivership, their actual value was conjectural; the trustee's attorneys thought them worth between $500,000 and $600,000; that is all we know. The second note of the bankrupt held by the New York Trust Company was secured by collateral, whose owner does not definitely appear, except that it was not the bankrupt. The other bank, the Chemical Bank & Trust Company, held a note of which the bankrupt was also maker, and the National Electric Power Company indorser; it was also secured, but again none of the collateral belonged to the bankrupt. The books of the four companies disclosed mutual borrowings and loans in very large amounts, as to whose validity, even after elaborate reports by accountants, nobody could be sure. To toll the statute of limitations, claims extravagantly inflated to cover every possible contingency were prepared upon the basis of these records, and filed; and objections were also filed to them all.
The compromise provided first that the banks should release every party to the *861 notes, and transfer all the collaterals to a new company to be formed. In consideration of these the new company would execute and deliver to the two banks two issues of its notes, one issue for each bank. One hundred thousand shares of the new company were to be put into a voting trust, and of the voting trust certificates the New York Trust Company was to have 20,000, and the Irving Trust Company as trustee for National Electric Power Company, 62,500, and as trustee for Seaboard Electric Power Company, 17,500. But the bankrupt was to receive nothing for its collateral pledged on the New York Trust Company note, except any equity above $3,000,000, a right of fictitious value. The New York Trust Company was to provide working capital for the new company; the Chemical Bank & Trust Company was to return a preference to the bankrupt of $20,500. The four companies were to release one another from all claims filed, "in any wise arising out of * * * the notes mentioned * * * in Paragraph VI, * * * and * * * any of the collateral pledged * * * for such notes." Paragraph VI described the notes to the bank.
The referee set April 27th for a creditors' meeting to consider the compromise, and on April 26th, the appellants made a motion before the district judge to remove the trustee and its attorneys. They alleged no misconduct, nor any irregularity in the election; they did not suggest that the opposition in interest on which they relied had in fact resulted unfairly; except that they did say that the bankrupt ought to get some of the shares of the new company. They had worked along with the trustee's attorneys for eight months; had been shown all the books, had themselves employed a firm of accountants who made a detailed and very voluminous report. They did not, and could not, profess to be uninformed; nor indeed could any other creditors. While it would have been too burdensome for the trustee to send to each of the fifty-five hundred creditors of all four companies a complete copy of all the books, or even of its accountants' report  a very bulky document  such a report had been made, and a copy was filed with the referee, where it was accessible to every one. For these reasons the judge denied the motion to remove the trustee, and one of the appeals before us is from that order.
At the creditors' meeting upon the compromise on April 27th, there was a long discussion, at the end of which only a single creditor of Seaboard Public Service Company and the two appellants here objected. During the colloquy the appellants' attorneys declared that the money received upon the note to the New York Trust Company for which the traction securities were pledged, had not all gone to the bankrupt's treasury, but "that a large portion of that loan was utilized for the benefit of all companies." They did not, however, attempt to assert or prove what part of the borrowed money had been so diverted, though they must have known all the facts; nor did they call on the trustee to say. They did ask for an adjournment to produce testimony; it was given them, and they produced nothing. They then asked for a day's adjournment to put in a brief, which was also given them; they filed no brief. The trustee's attorney was in attendance; he explained a good deal in answer to other creditors, and offered to answer any questions. Much talk followed, but no formal complaint was made, or indeed complaint of any sort except in the general form we have already mentioned. On the adjourned day the referee, finding no opposition but the appellants', gave the trustee leave to make the desired compromise. It is from the affirmance of this order by the district judge that the second appeal is taken.
Before proceeding to the main issues, we wish to say a word about the record submitted on each appeal. That upon the order of removal should have contained nothing but the petitions, affidavits, order, opinion and appeal papers. Instead of being so limited, it contains what are called the "minutes"; that is, the complete stenographic reproduction of all the talk in court; this indeed by direction of the judge himself. It seems to be supposed that in some way this becomes a part of the proceedings, and especially in insolvency there has grown up a practice of treating as a "Record," any amorphous mass of colloquy without warrant for existence. We shall hereafter refuse to consider such minutes of what was said on a motion except so far as it is formally reduced to a written stipulation, limited to the substance of what is conceded by the parties. They may have stenographers in court if they will, or dictaphones for that matter, but the district judges are not to send up the minutes. Nor should the stenographic minutes at the creditors' meeting before the referee have been printed and sent up as they were. The referee may keep his own minutes, but they should consist only of an abstract of what takes place at the meeting; for example, the appearances, the votes, formal resolutions; in general, *862 what was actually decided and done; that is all that we will receive. The existing practice of asking us to piece out admissions from long colloquies extending over many printed pages, we shall no longer recognize. In re Syracuse Stutz Co. (C. C. A.) 55 F.(2d) 914, 917.
Upon the appeal from the order allowing the compromise, there are no decisions to guide us. Section 27 certainly presupposes that the creditors shall be advised of the facts fully enough to act intelligently, and the trustee must see to it that they are. He must make a full statement of the relevant facts in his petition for leave and must be prepared at the meeting to advise the creditors fully. When he has done this, ordinarily their wishes should prevail, both with him and with the referee, who however has always the last word. National Surety Co. v. Coriell, 289 U. S. 426, 53 S. Ct. 678, 77 L. Ed. 1300, concerned a reorganization and was not in bankruptcy anyway; but the admonitions there given, so far as they related to proper publicity, the treatment of creditors, and like matters, may well be equally applicable to compromises under section 27. Even so, we think that the evidence here meets the test. The creditors had been already advised so far as was really practicable, by an exhaustive accountants' report, by frequent conferences with creditors' committees and by an exceptionally full petition. It is true that the securities belonging to the bankrupt, pledged with the New York Trust Company, were not appraised; and it is also true that they were to be surrendered for nothing. However, if the bankrupt was in fact the primary obligor, its property ought to have been sold first anyway, and the face of the loan was larger than the face of the securities, all of them in insolvent companies. Appraisal in such circumstances would have been an idle form. There was thus at hand the means for an "informed, independent judgment," made after "adequate, trustworthy information," so far as it could be given, and the trustee was ready to supply any omissions at the meeting. Cf. First National Bank v. Flershem, 290 U. S. 504, 54 S. Ct. 298, 78 L. Ed. ___, January 8, 1934.
The only material doubt, so far as we can see, is whether the bankrupt was truly the primary obligor on the larger note of the New York Trust Company; that on which alone it had pledged any property. All that the appellants even asserted was that the proceeds of that loan had been divided; they did not say how, though they must have known, nor did they suggest that the sum, for which even on their own theory the bankrupt was primarily liable, was less than the value of the traction securities. Certainly if it had received as much of those proceeds as the collateral would bring at a sale, the settlement was a fair one. The appellants did not ask the trustee for information about all this, and did not need it; they said they would make proof and they failed to do so. In this situation we should not assume (1) that the bankrupt did not receive all the proceeds of the loan merely because the appellants said so; (2) that if it did not, the part which it did receive was less than the sale value of its collaterals in the loan; (3) that even if that value was greater than the sum which it received, it was not a good compromise for it to release the surplus in order to be relieved of all liability upon the three notes. The only other question is as to the release of the cross-claims between the four companies. Plainly, if the settlement was to be worked out through a new company which should hold the collateral, it was essential, in dividing its shares, to settle all claims between the four companies; that was as far as the releases went. The bankrupt had no possible claim against the other companies except that arising from its collateral. Had it been forced to pay the notes, though not in truth the primary obligor, the opposite might be true; but in fact both banks were to release it in full. It could have no claim in the future against the other three bankrupts, and what it had already paid to the Chemical Bank & Trust Company was declared a preference, and returned. Whatever injustice may have been practiced on the other companies, this bankrupt could have no complaint. Finally, it must be remembered that time was important; the banks had matters in their own hands and might at any minute sacrifice the collateral. This had happened twice already, and the spring of 1933 was not a season in which further patience could be relied upon. It seems to us within the powers of the creditors and the referee to accept the compromise and they have done so by a greatly preponderating choice. The order is affirmed.
The motion to remove the trustee and his attorney stands on a different footing. The absence of an independent trustee might itself be enough for a removal if urged by other creditors than the appellants. Wilson v. Continental B. & L. Ass'n, 232 F. 824 (C. C. A. 9). It is not enough that a creditor has means of information; he may insist that his interests shall be in the hands of a trustee who can act without embarrassing cross currents *863 of motive; that he (the creditor) shall not be required to prove that the trustee has failed to press his interests; that the trustee's impartiality must be free from all question. For these reasons the unity of administration might be successfully challenged for the future, though the compromise is proper, and must be confirmed. True, such unity would not necessarily be a decisive impropriety; it would be possible, whenever a real conflict arose, to have the trustee represented by two separate attorneys, and by opposing groups of creditors. But that is a cumbersome method at best, and besides it presupposes that all questions in which there may be such a conflict will be apparent either to the creditors' committee, or to the trustee who will present them to the referee for special action. We are not impressed with this as a desirable way to administer an estate. On the other hand, it must be owned that there are very strong reasons for managing these particular properties singly. These were not four independent businesses, each operated by a separate company; the operating units were indeed independent but the bankrupts did not divide them between themselves separately; they were holding companies, with complicated subinfeudations. They had no separate business to operate, and, do what one might to divide them, their affairs were not divisible. Therefore the answer seems to us in the end rather doubtful, though it would perhaps be hard to deny the demand of a creditor, who had insisted in season and in good faith that the estates should be separately administered. At any rate, we shall assume arguendo that he would succeed.
We can so assume because it seems to us that the appellants may not raise the question. The Utilities Power & Light Company, as we have said, did indeed complain to the trustee and its attorneys at the outset; they were told that these gentlemen saw no impropriety in the situation. They did not then take the question to the referee; instead they continued working along with the trustee, its attorneys, and the creditors' committees in the consideration of the many reorganization plans. Nobody would have supposed that they meant to bring up the matter if any plan had got acceptance; good faith forbade such a course. After all the plans for reorganization broke down, they co-operated in the exceedingly onerous work of preparing the compromise with the banks; they did not seek to balk this because of the single administration. The compromise was settled; the trustee's petition for leave was filed; the time for the creditors' meeting was fixed and the creditors advised. Not till then, and then by motion returnable on the very day before the meeting, did they even intimate to any court that the whole proceedings had all along been violating cardinal doctrines of equity. After a complaisance of over eight months during which they had gone along hand in hand with the trustee, they proposed to upset the compromise, and to change the future administration of the estate. Other creditors may be entitled to ask us to do this, but we are not disposed to hear that complaint in the mouths of these appellants. In re Rury, 2 F.(2d) 331, 332 (C. C. A. 9); In re Arti-Stain Co. (D. C.) 216 F. 942, 943. We have throughout treated Mary A. Walsh as in the same position as the Utilities Power & Light Company. Being before us by the same attorneys, who do not distinguish between her and their other client, we see no reason for doing so ourselves.
Orders affirmed.

On Petition for Rehearing.
PER CURIAM.
In saying that the appellants co-operated in preparing the compromise with the banks, we probably went too far. Again it is true that Walsh and the Utilities Company were represented by different attorneys, but they filed a single brief and made no distinction between their clients. Otherwise we see nothing to correct.
The petition for rehearing is denied.