**In re McCRORY STORES CORPORATION.**

No. 56239.

District Court, S. D. New York.

Nov. 12, 1935.

See, also, 12 F.Supp. 267.

PATTERSON, District Judge.

A prior plan of reorganization was rejected as discriminating unfairly in favor

of United Stores Corporation. It was held that the landlords' claims purchased by the United could not be valued for purposes of reorganization at more than the amount paid for them by the United, plus the reasonable cost of acquisition. Since the plan then under consideration gave to the United more than that figure, it was disapproved. The opinion on that plan contains an outline of the claims against the company and of its capital structure.

Two plans have since been submitted, each of them modified after submission. Both conform to the limitation already placed by the court on the allowable value of the claims acquired by the United.

The Harris plan. The Harris plan is backed by a committee acting for holders of about one-half the common stock. The debentures and the merchandise claims are to be paid off in cash, in full with interest. The claims of Green and Coppedge are to be paid in cash to the extent of $24,000, the balance in new common stock. The United is to be paid off in cash at its cost of acquisition, together with reasonable expenses not to exceed $150,000. All other landlords' claims are to be paid in cash, to the extent that such claims may be allowed or settled. The holders of preferred stock are to get new preferred, share for share, and cash to cover all accrued and unpaid dividends. The holders of common will receive new common, share for share (this requiring 443,000 shares), and the right to subscribe for 499,000 shares of new common at $10.75 a share.

The money necessary to carry out the plan is to be raised by the sale of new debentures in the amount of $4,552,000, and by the disposal of the new shares of common stock. The Harris committee estimates that by sale of such new securities enough cash will be forthcoming to pay off all claims and reorganization expenses and to leave working capital of $6,000,000 for the company. There is presented an underwriting agreement by F. S. Mosely & Co. and Lehman Bros. By this agreement the underwriters agree to purchase the debentures at 97½ and to underwrite the offer of new common to the stockholders at $10.75 a share. As compensation for the underwriting, the provision originally was that the underwriters would receive $.75 a share on the 499,000 shares offered to stockholders for subscription, and also a five-year option to purchase 99,000 shares of new common at $10.75 a share. This has since been modified to eliminate the five-year option and to provide that the underwriting fee will be $.75 a share on the 499,000 shares, together with the following additional sums: $.50 a share for each share actually taken up by the underwriters in excess of 50,000 up to 100,000; $.75 a share for each share taken up in excess of 100,000 up to 200,000; and $1 a share for each share taken up in excess of 200,000.

The underwriting is conditional. The underwriters' commitment is subject to the following conditions: (1) That on consummation of the plan the net current assets of the company will be at least $5,000,000; (2) that the leases, executory contracts, and employment agreements of the company shall be satisfactory to the underwriters, the right to withdraw for dissatisfaction on this ground to be exercised not later than twenty days after court approval of the plan; (3) that the plan be finally consummated before February 1, 1936; (4) that the operations and condition of the company shall be as favorable at the time the new securities are delivered as at present; (5) that at the time when the new securities shall be delivered a war or political or economic change shall not have occurred which in the underwriters' judgment will materially and adversely affect the marketability of the securities to be purchased or underwritten; (6) that the shares of new common underwritten shall not be offered to stockholders until after the plan has been finally confirmed by order of court from which no appeal can be taken or as to which the time to appeal has expired. Finally, it is provided that if the underwriters shall discover, at any time prior to the offering of the new stock to common stockholders, that any of the above conditions (except the second) have not been or will not be fulfilled or that any material assumption on which the plan is based does not or will not exist, they shall be under no obligation to proceed.

The Merrill plan. This plan is presented by a committee representing holders of about one-third of the common stock. Just as under the Harris plan, the debentures and merchandise claims are to be paid in cash, in full with interest; the Green and Coppedge claims are to be paid, partly in new common stock and

partly in cash; the landlords' claims not acquired by the United are to be paid in cash at the allowed or settled amounts; the holders of present preferred shares are to receive new preferred, share for share, with all back dividends paid in cash. From this point on, the Merrill plan differs in several respects from the Harris plan. The landlords' claims acquired by the United (taken at the aggregate figure paid by the United to the landlords, plus such interest as the court may allow, plus also $150,000 or such other figure as the court may allow for reasonable expenses of acquisition) are to be discharged by the issuance to the United of not more than 280,531 shares of new common stock at $10.75 a share and by payment of any balance in cash. The holders of common stock will get new common, share for share. They will also have the right to subscribe at $10.75 a share to such number of new shares as may be required to bring the net current assets of the company up to $6,000,-000. The estimated total of new common shares is 942,000, the same figure as with the Harris plan. It is provided that in case the actual number shall fall below that figure, the price of $10.75 for the new shares will be increased in due proportion, the increased price to apply both to the shares to be issued to the United in satisfaction of its claims and to the shares to be offered for subscription to present stockholders and to be underwritten.

The new money under the Merrill plan is to come from the sale of $4,552,000 new debentures and from the offer of the new common shares to stockholders. The sale of the debentures is unconditionally underwritten by the United at 97½ without deduction of any commission; and the United agrees that if the debentures are sold by it at a price better than 101, it will turn over one-half the excess to the company. The offer of the new shares to common stockholders at $10.75 is unconditionally underwritten by the United for a commission of $.75 a share, no commission to be paid, however, on such shares as may be actually taken up by stockholders.

The Harris plan is backed by a group of common stockholders. The Merrill plan is backed by another group of common stockholders; it has also the support of the bulk of the creditors and preferred stockholders, as well as the support of the United.

The record made at the hearings on the prior plan shows the need of a prompt reorganization. The company has been under court control for nearly three years. Long-continued administration of the business by a trustee under court supervision does not promote the best interests of either creditors or stockholders. There is appreciable risk that unless the company is lifted out of reorganization valuable business sites and other advantages may be lost to competitors. These and other considerations move the court toward approving a fair and feasible plan presently proposed, as against the possibility that a better plan might be submitted at some indefinite time in the future. The statute under which this proceeding is brought contains provisions indicative of a purpose on the part of Congress that reorganizations be effected with reasonable celerity.

I am of opinion that the Merrill plan with its underwriting is preferable to the Harris plan with its underwriting, both on the score of feasibility and on the score of fairness to all parties interested in the company, and that the Merrill plan deserves approval by the court.

1. The debenture holders and general creditors have been held off for nearly three years. Their claims are liquidated and with accrued interest come to nearly $9,000,000. They want their money without further delay and are entitled to the best assurance possible that if a plan is approved and later confirmed, their claims will actually be paid. Under the Merrill plan, they have definite assurance. The plan is unconditionally underwritten by the United, and on confirmation the United will be held firmly bound to put up the necessary money. Its financial responsibility has not been questioned. Under the Harris plan the creditors get nothing like the same assurance. The underwriting accompanying that plan, while offered in good faith, is fettered with conditions, several of them sweeping and of a duration that cannot be forecast. The underwriters, months after approval and confirmation, may withdraw in case the outlook is not to their liking when the time comes to carry out the plan, and with their withdrawal the plan collapses. Even after confirmation, risks are left with

the creditors and stockholders rather than it. with the underwriters. Again, the underwriting calls for final consummation of the plan by February 1, 1936, but at the same time requires that consummation be suspended until after confirmation of the plan "by a court order from which no appeal can be taken or as to which the time to appeal has expired." As it is virtually certain that the United, if not others, would appeal from any order confirming the Harris plan, the time limit of February 1, 1936, for final consummation destroys the efficacy of the underwriting and will have the practical effect of making performance optional with the underwriters. From the viewpoint of creditors, therefore, the Merrill plan has advantages definitely outweighing anything offered by the Harris plan, and the creditors' vigorous support of the Merrill plan is no more than natural.

2. There is proof in the record that a concern doing the gross business now being done by the company ought to have working capital of at least $6,000,000. Under the Merrill plan, working capital at that figure is guaranteed by the United. Under the Harris plan, it is by no means certain that the company will start off with $6,000,000 in working capital; it may well be that working capital will be nearer $5,000,000. While the point is of no interest to creditors, it is matter of concern to preferred stockholders and common stockholders.

3. The cost of the new money required to carry out reorganization is also a matter of concern to common stockholders, since this expense is one ultimately to be borne by them. Under the Merrill plan, the underwriter's commission will be from zero up to $200,000, depending on how many shares offered for subscription to stockholders are taken up by them. Under the Harris plan, the underwriters' fee will be from a minimum of $374,000 up to a maximum of $800,000, depending again on how many shares are taken up by stockholders, and the company must also pay the underwriters' legal expenses. The saving in underwriting charges under the Merrill plan will range from $400,000 to $600,000.

4. An important advantage presented by the Merrill plan is that adoption of that plan will foreclose further litigation by the United relative to the amount allowable for landlords' claims acquired by

it. It has already been held that those claims cannot be taken at more than the expenses of acquisition, which is something under $3,000,000. Approval and confirmation of the Harris plan, on the other hand, would leave the way open to the United to press its position that the claims held by it have an allowable value far in excess of its cost of acquisition. In this court it would be defeated, as indicated by the opinion on the prior plan; but the result in appellate courts could not be predicted with certainty. If the United were to succeed in such litigation and eventually establish a value of $6,000,000 or $7,000,000, the blow would be a heavy one to stockholders. The mere existence of such litigation would postpone reorganization for an indefinite time; its continuance beyond February 1, 1936, would of itself result in withdrawal of the Harris underwriting. It may further be noted that acceptance of the Harris plan would also dissolve the settlement made by the United with Goldberg and Chain Store Products Corporation, leaving the latter free to litigate their claims against the company. Those claims were filed for amounts far larger than their cost to the United, and one cannot say offhand what their allowable value might be. The Merrill plan is more advantageous in holding the United down to bare cost of acquisition and eliminating litigation with the United and these other claimants in respect of the value of their claims.

5. By the Merrill plan, the United's claims are taken at cost of acquisition, plus reasonable expenses, and are to be paid in common stock at $10.75 a share. By the Harris plan the amount of the claims is the same, but the payment is to be in cash. The objection of the Harris committee to payment in stock is twofold: First, that the price of $10.75 is too cheap; second, that payment in stock at any price violates the pre-emptive right of the present holders of common stock.

First, as to the price. There is every indication that the price of $10.75 a share for the new common stock is a fair and reasonable price. The current earnings of the company do not support a higher figure. Moreover, the stock is the same stock for which the underwriters produced by the Harris committee are willing (conditionally) to pay a net figure of only $9 or $10 a share. It is difficult to fol-

low the reasoning which maintains that $10, or even $9, is a fair price for the Harris underwriters to pay, but that $10.75 is too little for the United to pay.

█ Second, as to the pre-emptive right. It may be that if the company were a concern in ordinary course of business and not in default with its creditors, the matter of pre-emptive right of stockholders in any new issue of stock would be of prime importance. The ordinary rule is that the right of stockholders to subscribe proportionately to an issue of new shares is inherent in ownership of stock, and it is of no moment that a better cash price for the new shares might be paid by outsiders. But it is plain that where a company is unable to pay its obligations and is in course of reorganization under section 77B, Bankr.Act (11 U.S. C.A. § 207), the pre-emptive right of stockholders in an issue of new stock must be dispensed with where that course is necessary to do justice to creditors whose unpaid claims are paramount to the pre-emptive right or any other right of stockholders. The act is explicit enough on the point. It provides, in subsection (b), 11 U.S.C.A. § 207 (b), that a plan "may include provisions modifying or altering the rights of stockholders generally, or of any class of them, either through the issuance of new securities of any character or otherwise"; further, that it "shall provide adequate means for the execution of the plan, which may include * * * the issuance of securities of the * * * debtor * * * for cash, or in exchange for existing securities, or in satisfaction of claims or rights, or for other appropriate purposes."

█ A fair answer to the Harris argument respecting pre-emptive right is that the Harris plan itself is an infringement on the pre-emptive right of stockholders. It now calls for issuance of new shares of common stock in satisfaction of the claims of Green and Coppedge, without any prior offer of such stock for subscription to existing stockholders. And the Harris plan formerly provided that 99,000 shares of new stock be placed under option to the underwriters for five years, without prior offer of the stock to stockholders. On the oral argument that feature of the Harris plan was defended as fair and proper, although it is manifest that the pre-emptive right of stockholders would have been seriously impaired by the issuance of any such option. But these things aside, the insistence by a group of common stockholders on the unimpairment of their right to purchase all new shares cannot be countenanced in the face of demands by creditors that no plan be approved which does not assure them of prompt payment of their claims. If the stockholders insist on the right to subscribe to all new shares of stock, they are bound either themselves to deposit the money required to pay creditors or to tender a firm underwriting by others that on confirmation the money will be put up. As already pointed out, the Harris plan with underwriting does not meet these requirements.

An order may be submitted approving of the Merrill plan.