**In re BURNS BROS.**
No. 62409.

District Court, S. D. New York.
Feb. 4, 1936.

PATTERSON, District Judge.

The debtor filed petition for reorganization on May 24, 1935. The petition alleged insolvency and inability to meet maturing obligations. An order was entered continuing the debtor in possession until return of an order to show cause. On the return day various creditors and stockholders made warm opposition to the debtor being permitted to remain in possession and asked for appointment of a trustee. It was charged that the debtor's business had been ruined because of domination by two groups of wholesale coal companies, the Lehigh group and the Lackawanna group; that if equity were done between the debtor and these wholesale coal companies. the debtor would turn out to be solvent; that the reorganization proceeding was merely an effort by these dominant companies to shake out the stockholders and seize the debtor's business for themselves. The court referred the matter to Referee John E. Joyce, as special master, to take testimony and report on three points: The continuance of the debtor in possession, insolvency of the debtor, and the proper classification of creditors. A committee of opposing stockholders was given permission to put accountants of their choice on the debtor's books. Hearings on the referred matters were held before the special master and testimony taken. Before conclusion of the hearings, however, the debtor filed a plan of reorganization. The plan came on for hearing before the court. Almost all of those who had earlier made

charges against the wholesale coal companies and against the debtor's management supported the plan. The issue of fairness of the plan was referred to the same special master, to take testimony and report. Further hearings were held and testimony taken. The special master has now reported that the plan is feasible, fair, and equitable, and does not discriminate unfairly in favor of any class of creditors or stockholders. Motion is made to confirm the report. Certain other motions relative to allowance of claims of the wholesale coal companies are also before the court.

The debtor is a holding company, with subsidiaries in the retail coal business in the New York territory. For some years it has carried on business at a heavy loss and its credit is exhausted. The assets were shown to have a value of about $6,000,000, exclusive of good will. The good will has considerable value, notwithstanding heavy losses and declining volume of business. It is safe to say, however, that the value of good will does not exceed $2,500,000. The total assets are thus in the neighborhood of $8,500,000. The liabilities were proved to be about $19,000,000, of which nearly $18,000,000 is owed to the two wholesale groups. The result is insolvency by a wide margin, unless there is merit in the charge that the coal company groups have milked the debtor for years and that the debtor has claims against them for the consequent damage. Any such claims or counterclaims would have to show a value of over $10,000,000 to render the debtor solvent. The question whether or not there was a basis for such claims was a pertinent matter for inquiry under both references to the special master. He took all testimony that was offered along this line. The debtor made its books and records accessible to creditors and stockholders.

The facts brought out show that the debtor's troubles came from an expansion undertaken at an unfortunate time and with inadequate resources. On December 6, 1929, it made an agreement with the Lehigh companies, whereby it leased from one of them, Luzerne Coal Corporation, certain plants known as the Rubel plants, for ten years at an annual rent of $517,869.63, and agreed to purchase exclusively from the Lehigh companies the coal requirements for the leased plants. The Rubel plants had been acquired by the Lehigh companies at about the same time for $8,000,000. By the same agreement it was recited that the Lehigh companies had sold to the debtor the entire stock of Frank L. Burns Coal Company and of Horre Coal Company, for which the debtor gave notes totalling $1,628,243.62, and agreed to pay $165,298.68 annually for ten years and agreed to make a final payment of $2,754,977.71. The stocks of Frank L. Burns Coal Company and Horre Coal Company had cost the Lehigh companies $4,383,221.33.

The Lackawanna companies (Glen Alden Coal Company and Delaware, Lackawanna & Western Coal Company) came into the picture in 1931. By this time the debtor was in dire straits. It owed large sums on bank loans and on coal sold and delivered. By agreement of March 4, 1931, Lackawanna loaned the debtor $9,000,000 against its 5 per cent. notes, the money to be applied to payment of bank loans, coal accounts, and other debts, the balance to be retained for working capital. The Lehigh group subordinated their claims to the new notes and consented to a reduction of the rent on the Rubel yards. By the same agreement the debtor undertook to purchase 80 per cent. of its coal requirements from Lehigh and Lackawanna equally for fifteen years, at prices and terms as favorable as those given to others, and agreed to the deposit of a majority of both classes of its common stock in a voting trust for ten years, one trustee to be named by Lehigh, one by Lackawanna, and one by Chase National Bank. This agreement was approved by the stockholders of the debtor at a meeting duly called. There was lively opposition, but the vote in favor of the agreement was a heavy one. The voting trusts were set up. The voting power, however, passed to the preferred stockholders in 1932, because of defaults in payment of dividends on preferred stock. The preferred stock was publicly held; the wholesale coal companies owned none of it.

At the time of the Lehigh contract in 1929, the Lehigh group had two directors out of eleven on the debtor's board, and owned 51,000 shares of class B stock. At the time of the 1931 contract, Lackawanna owned 10,000 shares of class A stock purchased in 1930; no one connected with it sat on the board. Subsequently, in April, 1931, two Lackawan-

na men were elected to the board. The stockholdings of the two companies together gave them 70,000 votes out of 300,000 votes, until the common stock lost the right to vote in 1932.

The special master, in addition to reporting the above facts, has reported that there is no evidence that the Lehigh and the Lackawanna dominated the debtor, no evidence that the 1929 and 1931 contracts have not been adhered to in good faith by them, no evidence that the debtor has been charged more than the indicated prices of coal. The debtor has been favored in certain respects, as by sales at less than circular prices and by discounts allowed after expiration of the discount period.

Under the proposed plan, the liabilities to be dealt with are: Notes payable for 1931 coal purchases, held by Lehigh and Lackawanna, $1,464,725.27; 5 per cent. notes, issued under the 1931 agreement and held by Lackawanna, $8,484,637.51; purchase obligations for the stock of Frank L. Burns Coal Company and Horre Coal Company, held by Lehigh, $3,402,577.69; accrued and unpaid rent for the Rubel properties, held by Lehigh, $1,964,657.34; Perry purchase certificates $1,005,219.60; landlords' claims for damages, held by Lehigh and estimated at $2,600,000. All are general unsecured claims, a total of $18,921,817.41. All of these claims, except the Perry certificates, are held by the two coal company groups. The Perry certificates are held by a number of persons. The present capital structure consists of 24,110 shares of preferred stock, of a par value of $2,411,000; 99,350 shares of class A common, of no par value; 99,400 shares of class B common, of no par value. The class A has priority over class B, and each share of class A has two votes as against one vote for each class B share.

The plan proposes (1) that holders of general claims not in excess of $100,000 (these are the Perry creditors) will receive for each $100 a new Series A debenture for $40 and 1 share of new common stock; (2) that holders of general claims in excess of $100,000 (these are the Lehigh and the Lackawanna) will receive for each $100 a new Series B debenture for $30; (3) that holders of preferred stock will receive 1 share of new common for each share of old preferred; (4) that holders of class A common will receive 1 share of new common for each 10 shares; (5) that holders of class B common will receive 1 share of new common for each 50 shares. The Series A debentures will bear fixed interest at 5 per cent. and will have priority as to interest, though not as to principal, over the Series B debentures. On the latter interest will be paid only if earned.

Other features of the plan are these: The lease of the Rubel properties is to be terminated, except as to certain enumerated yards deemed to be profitable. All trade accounts, salary claims, mortgage claims, leases for executive offices, and current obligations in course of business will be paid in cash or assumed by the new company. The existing 80 per cent. coal purchase contract is to be canceled and a new agreement made with the Lehigh and the Lackawanna, whereby the new company will purchase 80 per cent. of its anthracite requirements from them as long as its mortgage bonds or preferred stock are outstanding, at prices and terms as favorable as those extended to other customers in this territory, with appropriate provisions for verification of prices from time to time. In consideration of this agreement, the Lehigh and the Lackawanna will purchase at par 50,000 shares of preferred stock of the new company of the par value of $5 each, and will also purchase at face value not less than $1,000,000 and not more than $1,500,000 principal amount of general mortgage bonds of the new company, the cash so raised to be used for payment of current obligations, expenses of administration, and working capital. The new preferred stock will be convertible into common, share for share, and will have exclusive voting rights, except that the common stock will be entitled to elect three out of eleven directors.

If this plan is consummated and the maximum amounts of new securities are issued, the new company will have the following funded debt and capital structure: General mortgage bonds $1,500,000; debentures $5,819,000, of which $444,000 will be Series A and $5,375,000 will be Series B; 50,000 shares of preferred stock of $5 par value, or $250,000; 47,085 shares of common stock without par value, of which 11,052 shares are to go to present Perry creditors; 24,110 shares to present preferred stockholders; 9,935 shares to present class A stockholders; 1,988 shares to present class B stockholders.

The plan is said to be the final evolution of conferences and bargaining by representatives of the debtor, the coal company groups, the Perry creditors, and the stockholders, in the course of which many concessions were made by the coal company groups to the Perry creditors and stockholders. It now has the support of all committees (two committees of Perry creditors, a committee of preferred stockholders and a committee of class A and class B stockholders), and has the consents of more than the requisite percentages of creditors and stockholders.

Of the two motions made by the debtor and heard with the motion to confirm the special master's report, the first is a motion for an order allowing certain claims as filed, for purpose of participation in the plan. Among the claims filed in due course were the following in behalf of the Lehigh and the Lackawanna:

| | |
|---|---:|
| Lackawanna, on note representing coal sold and accrued interest.. ............. | $ 703,187.07 |
| Glen Alden Coal Company, a company allied to Lackawanna, on 5 percent notes ................................... | $8,484,637.51 |
| Lehigh, on note for coal sold and accrued interest ............................. | $ 761,538.20 |
| And for rent.............................. | $ 3,350.00 |
| Luzerne Coal Corporation, a subsidiary of Lehigh, for purchase price of stocks of Frank L. Burns Coal Company and Horre Coal Company.................... | $3,402,577.71 |

The debtor has no objection to these claims and asks that they be allowed for purposes of the plan and its acceptance and confirmation.

The second motion is for allowance of claims for accrued rent of the Rubel yards and for damages because of rejection of the Rubel lease, not at the amounts for which filed, but at reduced amounts agreed on by way of compromise. These claims are held by Luzerne Coal Corporation, a Lehigh subsidiary. The claim for accrued rent was filed for $2,005,123.19. The debtor disputed liability to the extent of $40,-465.85, and conceded liability for $1,964,-657.34. The claimant has consented to the reduction of the claim to the latter figure. The claim for damages on the debtor's rejection of the lease was filed for $3,100,035.65, being for three years' rent, for loss of personal property, and for failure to preserve and keep in repair buildings and structures covered by the lease. The claimant has agreed by way of compromise to reduce this claim to $1,516,519.65, provided the compromise

is approved by the court and the present plan of reorganization is carried out. The debtor's petition sets forth facts tending to indicate that the claim would be allowed for a larger figure if the matter were fought to a finish.

On the foregoing facts, it is evident that the present plan and the two motions incident to . it represent an effort to compromise controversies among creditors and stockholders of the debtor and to relieve the debtor of its financial embarrassments by a prompt reorganization. For all that is revealed in the record, the debtor is insolvent, its stock has no value, the coal companies have nearly 95 per cent. of the claims. A reorganization that took only these matters into account would see the stockholders eliminated and the coal companies with securities representing a 95 per cent. ownership of the debtor's assets and business, the remaining 5 per cent. going to the Perry creditors. But with the controverted question of an asserted liability in the situation and with the hope that a prompt reorganization will enable them to salvage more out of their large commitments than would a fought-out one, the coal companies have made concessions to the others interested. The Perry creditors are to get 40 per cent. of their claims in a better debenture, as against 30 per cent. in a poorer debenture for the coal companies. The Perry creditors are also to get a share of new common stock for each $100 in claims, for which the coal companies get no equivalent. The stockholders are to receive new shares in proportion to their seniority, and this without putting up new money. The new money necessary to rehabilitate the debtor is to come from the coal companies.

The compromise embodies in the plan struck the Perry creditors and the stockholders as a fair one. Large majorities of each class have registered their assent. Those who originally took an active part in opposition to the wholesale companies have in the main withdrawn their opposition and urge confirmation. It is of significance that while one or two Perry creditors still protested at the close of the hearings, no one then pressed any charge of dishonesty or fraud.

I am of opinion that the compromise put forth in the plan is fair. Full opportunity was afforded for any interested party to come forward and prove facts

tending to show any liability on the part of the wholesale coal companies. The proof that was taken points the other way. It is indicated that the coal requirements contract was valid at its inception, approved as it was by the stockholders, and that the coal companies have not cheated the debtor in the performance. From that contract no injury cognizable in law or in equity has been shown. That it would have been far better for the debtor not to have taken the lease on the Rubel properties is certain. The same is probably true as to the purchase on credit of the Frank L. Burns and Horre stock. But it is not perceived how liability for the loss from these disastrous transactions may be visited on the Lehigh; as for the Lackawanna, it had not the slightest connection with them. Without deciding directly that the debtor has no valid claim against these companies, the court does decide that there is strong reason to believe that no valid claim exists and that the plan constitutes a fair compromise.

■ It is the rule that where a court has the responsibility of passing on a proposed compromise concerning an estate in course of administration, the court must have before it sufficient information concerning the matter in dispute to reach an informed, independent judgment. See National Surety Co. v. Coriell, 289 U.S. 426, 436, 53 S.Ct. 678, 77 L.Ed. 1300, 88 A.L.R. 1231; First National Bank v. Flershem, 290 U.S. 504, 525, 54 S.Ct. 298, 78 L.Ed. 465, 90 A.L.R. 391; In re National Public Service Corporation, 68 F.(2d) 859 (C.C.A.2). That test has been met in this case. The record contains ample evidence concerning the relationship and the transactions between the debtor and the wholesale companies; and such evidence leads to the conclusion that the plan represents a just and fair settlement of the rights of the interested parties.

■ One of the Perry creditors contends that no sacrifice by him is in order as long as stockholders retain any interest. But, as pointed out by the special master, the new stock that is to go to stockholders comes entirely from the coal companies and not from the Perry holders. This feature of the plan is not unfair to Perry holders. I agree with the special master that Northern Pacific R. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931, is not controlling as to a reorganization of this character under section 77B, Bankr.Act (11 U.S.C.A. § 207).

■ The power of the court in a case of this type deserves discussion. The claims against the debtor have not been judicially determined in advance of consideration of the plan of reorganization. In the average case, the validity and the size of the claims against the debtor are first adjudicated; the plan is then scrutinized as to fairness in dealing with such claims. But I take it that under section 77B (11 U.S.C.A. § 207) the court has power to approve a compromise of controverted claims and to allow such claims at amounts agreed on by the creditors concerned and the debtor, where the court has sufficient facts before it to indicate that the compromise is a fair one; and in such instances it is not required that the ultimate merits of the claims be tried. This power is no more than that possessed in bankruptcy and equity receivership cases. Otherwise the estate involved might be wasted in tedious and expensive litigation. American District Steam Co. v. Waltermire, 231 F. 412 (C.C.A.6); Petition of Baxter, 269 F. 344 (C.C.A.6); Pullman Couch Co. v. Eshelman, 1 F.(2d) 885 (C.C.A.4); In re National Public Service Corporation, supra. It is a step further, possibly, to approve a compromise of claims within a plan of reorganization rather than prior to the plan; yet I am satisfied on the power of the court to sanction such a compromise also, and to allow the compromised claims as part of the plan. Take the case of landlords' claims for damages on rejection of executory lease. In a case where there were numerous claims of this character, final determination of the precise amount of these claims on the merits might take years. If a plan of reorganization had to await the outcome of such litigation, reorganization would frequently be a hopeless matter. In Re McCrory Stores Corporation, 14 F.Supp. 739, decided by this court November 12, 1935, a plan of reorganization embracing a compromise of landlords' claims against the debtor was approved, although there had been no prior order allowing such claims. There was sufficient in the record to satisfy the court that the compromise was a fair one.

■ The plan is found to be feasible, fair, and equitable, and not to discriminate unfairly in favor of any class. The re-

port of the special master will be confirmed. The claims of the coal companies in the amounts set forth in the debtor's petition will be allowed, such allowance, however, to be conditional on the confirmation and consummation of the present plan of reorganization.