**In re McCRORY STORES CORPORATION et al.**

District Court, S. D. New York.
Nov. 2, 1936.

Breed, Abbott & Morgan, of New York City (Charles H. Tuttle and Paris S. Russell, both of New York City, of counsel).

Irving Ben Cooper, of New York City (Irving Ben Cooper and David Haar, both of New York City, of counsel).

Rosenberg Goldmark & Colin, of New York City (Sidney Kaye and Godfrey Goldmark, both of New York City, of counsel).

PATTERSON, District Judge.

McCrory Stores Corporation was petitioned into bankruptcy on January 14, 1933. It had retail stores scattered over the country and did a business running into many millions. But it was committed on leases that called for the payment of larger rentals than it could pay, and in addition it owed obligations of eight millions to creditors. The business had been conducted at a loss and altogether the situation was a most complex one. The Irving Trust Company was appointed receiver and later trustee in bankruptcy, taking over the operation of the business. On July 5, 1934, a proceeding to reorganize the company was commenced under the provisions of section 77B (11 U.S.C.A. § 207) superseding the bankruptcy proceeding. Various efforts to rehabilitate the company proved unsuccessful. Finally a plan known as the Merrill plan was approved by the court in an opinion handed down November 12, 1935. (D. C.) 14 F.Supp. 739. Under the plan creditors were to be paid off in full, with 6 per cent. interest. The plan was opposed at the time by one of the two committees representing common stockholders, but after further concessions made to common stockholders in the latter part of November all parties made known their satisfaction with the plan. The plan was adopted by the necessary majorities of stockholders in late December and has since been carried into effect.

The matter presented now is the right of attorneys for two committees of creditors to obtain payment for services rendered, the attorneys claiming that they are entitled to be paid out of the moneys distributable to creditors represented by the committees. In the average case attorneys for creditors' committees look to the general estate for payment for services rendered in promoting reorganization under section 77B. Here, however, the claims of the attorneys are for payment not out of the general estate but out of the funds go-

ing to the creditors in payment of their claims. It having developed that the attorneys for creditors' committees were seeking to deduct percentages from the funds to be sent out by the trustee to creditors, the court made an order that the funds, over and above such percentages, be paid forthwith to creditors, that the moneys representing the claimed percentages be retained by the trustee until further order, and that the questions whether the attorneys were entitled to such percentages be referred to a special master to take testimony and report. The special master held hearings, took testimony, and reported adversely to the attorneys in each case.

1. *The Reader Committee.* The claim of Breed, Abbott & Morgan, attorneys for the Reader Committee, will be discussed first. This committee was formed in January, 1933; it was chosen at a meeting attended by a large number of merchandise creditors. The committee resolved to enlist the support of other merchandise creditors. Under date of January 18, 1933, the committee sent a letter to merchandise creditors, to the effect that it was to serve in the interest of creditors and was to assist in reorganization. In the letter creditors were urged to put their claims in the committee's hands, the claims to be handled and filed "without charge or deduction." A form of proof of claim and power of attorney appointing Reader, Davis and Clark attorneys in fact for the creditors was sent out with the letter, to be made out and signed by creditors. Reader was chairman; Davis and Clark were secretaries of the committee. On February 6, 1933, another letter was sent to merchandise creditors, urging them to route their claims through the committee. In the February letter the committee said that it was "working without any compensation whatever in the interests of all concerned." In response to these letters, creditors with claims of over $1,200,000 sent in their claims to the committee and signed the power of attorney. The attorneys for the committee, as well as the chairman of the committee, did a good deal of work, assisting the trustee in administering the estate, forestalling ancillary receiverships, opposing claims filed by landlords, discussing proposed reorganization, and so on.

Directly after the opinion approving the Merrill plan of reorganization came down in November, 1935, the committee sent out a notice to creditors, calling attention to

the opinion, particularly to the fact that under the plan the creditors would receive full payment in cash, with about 18 per cent. interest. It was set forth that for the services and expenses of committee and attorneys the committee proposed to deduct 6 per cent. from the principal amount going to the creditors represented by the committee. The letter went on to say that the next step would be voting on the plan by the respective interests, and creditors were urged to sign an enclosed authorization to vote their claims in favor of the plan. The inclosed authorization, addressed to the committee and to be signed by the creditor, contained an approval of the contents of the committee's letter, an acceptance of the plan, and an authorization to vote in favor of it. Under date of December 3, 1935, another letter was sent out to creditors, to the effect that the stockholders' committees had settled their differences concerning the plan, that December 27th had been set as the time for final confirmation, and that it was important that the committee be in a position to act effectively for creditors when the time came to vote on the plan. Creditors were again urged to send in their authorizations. Most of the creditors represented by the committee sent in authorizations.

■ It appears then that when the committee in 1933 solicited creditors to place their claims with it, the committee assured them that it was working without compensation. The committee went further; it told creditors that no charge or deduction would be made from the payments to be realized on claims. It goes without saying that such assurances were a factor, a potent factor, in persuading creditors to lodge their claims with the committee. These self-denying statements certainly bar members of the committee from obtaining compensation out of the cash proceeds of the claims. And the statement that there would be no charge or deduction also bars counsel for the committee from making a charge or deduction from such moneys, whether or not counsel were aware at the time that the statement had been made to creditors. To be sure, the chairman of the committee and the attorneys did a great deal of work. The work was done, however, on the assurance that the creditors represented would not pay for it. If committees, in order to win the support of creditors, commit themselves and their attorneys to work without charge against the creditors, they

have no fair grievance when they are held to their commitment.

The exchange of letters by the committee and the creditors late in 1935 does not change the result. In the November letter the committee proposed a deduction of six per cent. for its services and those of counsel, and it may be that creditors who signed the enclosed authorization, by approving of the contents of the committee's letter, approved of the deduction. But the proposal as to compensation was bound up with a statement as to voting on the plan of reorganization. Creditors reading the committee's letter might well have received the impression that unless they authorized the committee to vote their claims in favor of the pending plan, the plan, so beneficial to them, could not be carried into effect. Such an impression was reinforced by the December letter. As a matter of fact, however, the plan in the McCrory case was unique in that approval on the part of creditors was not called for; the plan gave them satisfaction of their claims in cash, without sacrifice or concession of any kind. And no vote by creditors was ever taken. It is argued that the situation was still so fluid and uncertain at the time of the November letter that a vote by creditors, formal or informal, might have been necessary or at least helpful. Whatever force there may be in that argument is lost when the December letter is considered. That letter was sent out after all organized opposition to the plan on the part of stockholders had disappeared. In the circumstances the creditors' authorizations in favor of compensation must be disregarded, under the provisions of subsection (b) of section 77B of the act (11 U.S.C.A. § 207 (b).

■ The attorneys also rely on an authorization from creditors in May, 1936, obtained when the payments were sent out to creditors. In the letters sending out the creditors' checks, it was stated that the 6 per cent. was deducted and withheld in accordance with the proposal in the letters of November, 1935. That was not the entire situation. The checks were sent out and the deduction retained because the court had so ordered. The argument now made, that the court in ordering payment to creditors of the undisputed amounts recognized the validity of the six per cent. charge, is utterly without force. This so-called authorization must also be disregarded.

920

■ The special master took the position that the attorneys represented the committee, not the creditors behind the committee, and hence were not warranted in seeking payment out of money belonging to the creditors. The soundness of this view may be passed, since the attorneys are foreclosed on other grounds from getting compensation from the creditors. From what has been said, it does not follow that the attorneys for the Reader committee will receive nothing. Like others who have assisted in reorganization, they may be paid out of the general estate for the services rendered by them in the course of the proceeding for reorganization. For the reasons already discussed the special master's report on the claim of the Reader committee and its attorneys will be confirmed.

2. *The Wiley Committee.* The other claim is that of Cooper, counsel for the Wiley Committee. The Wiley Committee was formed shortly after bankruptcy occurred, to represent merchandise creditors and employees of the McCrory company. Circular letters were sent out to creditors, to the effect that the committee was to help the trustee in the operation of the business and was to present a plan of reorganization, that broad support by creditors was essential. Creditors were urged to sign and send in to the committee an inclosed proof of claim and proxy. The proxy ran to the five members of the committee by name, and empowered them to attend creditors' meetings, to vote for or against any proposal and on the choice of a trustee, to accept or refuse any composition proposed by the bankrupt, to receive and collect dividends or fees, and in general to take such action and do whatever seemed best, as fully as the claimants could do if personally present.

The committee retained Cooper under a letter of February 8, 1933, addressed to him. The letter was to the effect that for services already rendered and for future services to be rendered in behalf of the committee and in behalf of the principals whom the committee represented as attorneys in fact, the committee would pay Cooper $25,000 and would also pay him 10 per cent. of any dividends or proceeds of payment paid to creditors represented by the committee. The initial $25,000 was paid out of a fund of $70,000 collected by the committee from certain of its supporters. The present claim of Cooper is for 10 per cent. of the moneys to be paid to creditors represented by the Wiley Committee, as agreed to by the committee.

The committee set itself up in business, maintaining offices and hiring employees. Cooper and lawyers associated with him performed services in the line of reorganization. They also performed services in attending to the interests of various creditors whose claims as filed were opposed by the trustee.

■ There is nothing to indicate that the creditors who sent in powers of attorney to the committee expressly authorized the committee to retain counsel to represent them. They did, however, give the members of the committee, as their agents, express authority to attend creditors' meetings, to vote the claims, to act on offers of composition, to receive payments of dividends, and generally to do whatever seemed best in the premises. They also clearly understood that they were making the committee their representative to assist the trustee in problems of administration and to take active measures toward reorganization. When these specific powers are viewed against the background of an insolvency of the magnitude and complexity presented by the McCrory company, I have no doubt that the power to engage counsel in the creditors' behalf was implied. The retention of counsel was a step reasonably necessary in carrying into effect the things that the committee had been specifically authorized to do by its principals. See Koscinski v. White, 286 F. 211 (D.C. Mich.); In re Opinion of the Justices, 72 N.H. 601, 54 A. 950. The power to retain counsel in behalf of the principals represented by the committee carried with it as a corollary the power to fix the compensation of counsel in any manner not unfair or unreasonable, and the power to bind the principals to the payment of such compensation.

■ The special master took the view that the contract of retainer was not a contract made by the committee in behalf of the creditors whom it represented, but was a contract by the committee in its own behalf; in other words, that the effect of the contract was that the members of the committee bound themselves to pay, out of their own pockets, an amount equal to 10 per cent. of the dividends to be received by the creditors. I am unable to view the agreement in that light. The committee's letter to Cooper is replete with ref-

erences to the representative character of the committee, and the sense of the agreement is that the members of the committee, not personally but as agents of the credi-.ors whose power of attorney they held, would pay the attorney ten per cent. of the dividends awarded to such creditors.

So the committee had power as agents or representatives of creditors to hire an attorney in the creditors' behalf and to make an agreement to recompense the attorney for his services. The agreement actually made was one whereby the attorney was to be paid 10 per cent. of the moneys to be received by the creditors. The remaining point is whether the committee's exercise of the power lodged with it is beyond review by the court, giving the attorney an absolute right to the stipulated compensation. If the case had remained in bankruptcy throughout and dividends had been paid out of an estate administered in bankruptcy, it may be that the attorney's right to the 10 per cent. share promised by the committee would have been absolute. But the case was not wound up in bankruptcy. It passed over to a proceeding on the reorganization side; the committee appeared in the proceeding in reorganization; the payments finally to be made to creditors are the outcome of the proceeding in reorganization, not of the bankruptcy proceeding. It follows, I think, that the agreement made by the committee relative to payment of counsel fees is subject to the "scrutiny" clause in subsection (b) of section 77B, and that the duty is laid on the court to see to it that the amount to be received by counsel is no more than commensurate to the services rendered. No fair doubt as to the power of the court to control counsel fees would exist in a case where a committee's agreement in behalf of the creditors behind it had been made after the case had passed over into a proceeding for reorganization. And I am of opinion that there is like power in a case where a committee's agreement on the matter of paying counsel was made prior to the institution of the reorganization proceeding. In both cases the authority of the committee to retain counsel and to bind creditors to payment of compensation to counsel is an authority the exercise of which is subject to supervision by the court in charge of the reorganization.

Under the reorganization act the standard of compensation set for those who perform services in the proceeding, wheth-

er payable by a group of creditors or out of the general funds of the estate, is the fair and reasonable worth of the services actually rendered, as distinct from the amount that may be agreed on by a committee in advance. The work performed by Cooper in the bankruptcy proceeding and in the reorganization proceeding was worth in my opinion the sum of $35,000. He has already received $25,000 and is entitled to collect the remaining $10,000 out of the balance of the payments now held by the trustee for the account of creditors represented by the committee, that figure to be prorated among the claims represented and deducted from the funds retained by the trustee on account of such claims. The figure so to be collected is less than the figure that would be owing under the ten per cent. arrangement.

The report of the special master on the Cooper claim will be modified accordingly.