### In re BALDWIN LOCOMOTIVE WORKS.

#### No. 18519.

District Court, E. D. Pennsylvania.

Feb. 4, 1937.

A. Allen Woodruff and William Clarke Mason, both of Philadelphia, Pa., for debtor.

Henry S. Drinker, Jr., of Philadelphia, Pa., for mortgage bondholders.

Edward A. G. Porter and Maurice B. Saul, both of Philadelphia, Pa., for preferred shareholders and for trustee for first mortgage bondholders.

L. A. Stebbins, of Chicago, Ill., and Richard K. Stevens, of Philadelphia, Pa., for objecting preferred stockholders.

Francis A. Lewis, of Philadelphia, Pa., for common stockholders' committee.

Loria & Martinson, of New York City, and Nathaniel S. Shaham, of Philadelphia, Pa., for Wm. A. Brady.

Arthur Garfield Hays, of New York City, for consolidated bondholders.

DICKINSON, District Judge.

This cause is now ripe for a ruling after leave given to submit briefs.

The questions presented arise out of what is known as a 77B proceeding. The genesis of the amendment to the Bankruptcy Act incorporated into the act as section 77B, as amended (11 U.S.C.A. § 207), has often been given but will bear repetition to afford light on the questions raised. The poor we have always with us, and at all times there have been those who were financially in embarrassed circumstances requiring readjustment of their debts. The first device was resort to a composition agreement. It was made binding upon all creditors by being made with the debtor and "with each other." Any relief afforded the debtor was wholly a matter of agreement. Corporations performing a public service had found a city of refuge in an equity receivership. Such bills were upheld by the courts in order that the public service might not be interrupted. Such receiverships were expanded to include corporations in need of a moratorium pending reorganization or liquidation. The courts had no equitable jurisdiction in such cases, but the practice was so convenient and useful that the question of jurisdiction was at first not raised. When it was, the courts held that the jurisdiction lacking was of a kind which could be waived and upheld receiverships if there was a confessing answer by the corporation and submission by it to the decrees of the court. By this time equity receiverships had become matters of course. Where the ultimate objective was not liquidation but reorganization, one obstacle was encountered. There was no way of enforcing a reorganization plan over the objections of minority creditors. This could, however, be done by a court in bankruptcy through the acceptance of a composition offer. The advocates of the section 77B plan evidently anticipated objections on constitutional grounds if the power was given to a court of equity to override the obligation of contracts. Courts of bankruptcy were acknowledged to have this power. The plan was in consequence made in form an amendment to the bankruptcy statutes. We thus have the approval of a plan of reorganization like in principle to the acceptance of an offer of composition in bankruptcy. It would be easy to point out differences, but these would go to constitutional objections to the legislation. No question of the constitutionality of the act is raised, and so is passed by without discussion. Any plan of reorganization however, just as a composition offer, must have the sanction of the approval of the required number of those affected thereby, and also the approval of the court. Either of two possible evils may present itself. The motive of objecting creditors may be wholly selfish and the objections an attempt to induce the majority creditors to grant to the objectors preferential treatment. The majority may likewise from selfish motives abuse the power they have to impose unfair terms upon the minority. The purpose of the act is to avoid both these evils. It seeks to do this by requiring the plan of reorganization to have the approval of the court. In giving or withholding this approval the court is not bound by the ordinary judicial limitations.

We think the court is not restricted to what is in evidence in the cause, but may seek help in that vague domain which is known as the things of which a court may take judicial notice.

The instant plan, for illustration, practically affects bondholders and stockholders, preferred and common. The bonds and stock are dealt in by any who may wish to take "a flier." The plan in question has been given wide publicity. The corporation in question is well known, and its securities dealt in on the Exchange and Curb markets. The market for its bonds and stock may be said to be world-wide. The reaction to the plan on the part of bondholders and stockholders and that of investors, speculators, and even gamblers in stocks and bonds have thus a value. In applying this test we find several curious anomalies. The plan is in ease of the corporation by reducing the burden of its

debts which is to be accomplished by cutting down its bonded indebtedness. From this general statement it would be expected that the bondholders might object, but the stockholders would surely approve. Instead of this, we find the reaction to be the reverse of this. The bondholders enthusiastically approve, and the opposition is limited to stockholders only. The stockholders are moreover divided in opinion presenting another, on its face, curious result. The preferred stockholders object to the plan as unduly favorable to the common stockholders, and the latter object because it gives the preferred stockholders an undue advantage. Even more interesting is the market reaction to the plan. As we have often had occasion to remark, the market price of anything is inscrutable. A weather vane is stability itself in comparison with the vagaries of the so-called market. No one can forecast what will influence its decisions. This is because, as before several times said, there is nothing which has happened, is happening, or seems likely to happen, anywhere in the world but may influence prices. The few who happen to make a good guess may think they know, but the many who have guessed wrong bear testimony that nobody knew or could know. If the holder of a bond, as here, was asked to scale down the debt, it would be expected that this would reduce the selling price of his bond. It was proposed here that the interest on the bonded indebtedness of the corporation be withheld and that the sum payable be reduced. The bonds were then selling at about $80. What would be the expected effect on the market price? An answer might be made that the price of the bonds would be reduced corresponding to the abatement in payment made. Instead of this the reaction was that the bonds jumped from about $80 to about $160 for every $100. If the possessor of the famous Aladdin's lamp had known of this he would have hidden his diminished head and traded his old lamp for a new one. Why a short term bond for $100 should sell for more than twice its redemption sum suggests a puzzle. If the bonds were given the privilege of exchange for stock which was worth more than the nominal sum of the bonds, the effect might be to enhance the value of the bonds. This increase might be said to be in a sense at the expense of the stock.

■ As the learned counsel for the minority preferred stockholders maintained in his impressive argument, it is the relative effect upon all the interests affected to which we must look. While the market reaction to the plan was to raise the price of the bonds 2 to 1, the corresponding effect upon the price of stock, preferred and common, was to raise it 3 to 1. If this reaction of the market was due to the plan, no one could say that its effect was an injustice to the stockholders, preferred or common.

■ It may be true that there is not much left of the old doctrine of the obligation of contracts, but it is recognized as still the law that creditors have a legal right to payment of their claims in full before stockholders get anything. It is true that bondholders have the legal right only to that for which their contract calls, usually debt with interest, but if the obligor cannot pay on the due date bondholders have the legal right to enforce payment. It may be that the management of this debtor was unduly alarmed by the approach of the due date of its bonds, and that resort to any readjustment of indebtedness plan was unnecessary, as the indebtedness might have been paid in full. On the other hand, failure to resort to the plan might result in consequences which would have been disastrous. The plain truth is that if a debtor cannot meet his obligation he is at the mercy of the creditor if he offers something other than money in payment.

What concerns this court is not the need of a plan, but whether the plan submitted is fair to all the interests affected thereby. The point sought to be made is that the question of the economic wisdom of a plan is best left to the judgment of those concerned. The attention of the court should be directed to the other question of whether it affects any interest unfairly.

The plan has been so fully analyzed and discussed by the learned master that we see no need to outline it. The master's analysis and discussion has met with commendation from all sides. In view of this, we may go directly to the exceptions.

### Exceptions of Preferred Stockholders.

■ These are supported by an exceptionally strong presentation of the views of counsel. With many of the propositions advanced we are in hearty accord. Regard should be had for rights of property. There should, however, be no distinction made between different kinds of property.

Yet property rights are invaded, and there are distinctions made. A debt claim is property, and the changes have long been rung on the obligations of contracts. When, however, the obligation becomes inconveniently burdensome, a change in terminology or phraseology is all that is necessary to get rid of it. Usually to say of any law that it is the exercise of the police power is sufficient to accomplish the purpose. The right of contract is a sacred right, but if we wish to regulate it we say it is "affected with a public interest." So with the word bankruptcy. A court of equity or of law cannot absolve one from the obligation of debt. Call the court a court of bankruptcy and it can. Originally, courts of bankruptcy were instituted to assure the equable distribution of the assets of a bankrupt among his creditors. Inasmuch as the debtor had given up all his property and assets to his creditors, it was thought right that he should be discharged of the obligation of his debts. At all events, he was so discharged. A stockholder is not a creditor of his corporation. Notwithstanding this, the provisions of section 77B extend not only to a restatement of the debt obligations of the debtor, but to "altering the rights of stockholders." Subdivision (b), 11 U.S.C. A. § 207(b). Unless the constitutionality of the act is attacked (which the exceptant here has not done), this provision of the act must be given effect. The plan when put into effect may thus encroach upon the rights of stockholders as fully as upon those of creditors. We see no limit to either, except as provided in the act. What was doubtless thought to be a sufficient check against abuse of the power was that it could not be exercised without the previous consent of the required majority of creditors or stockholders affected, but as an additional guard against the "tyranny of majorities," and for the protection of the minority, the plan is required to have the approval of the court. Here we recognize a distinction. A plan as a business proposition may be a wise plan or a foolish one. Without questioning the power of the court, it should in the exercise of the power defer to the business judgment of those whose financial interests are at stake. The fairness and justness of the plan, as affecting the minority, should be given careful and discriminating consideration. Whatever our own views, if we had any, respecting the business judgment displayed in this plan, we would yield our judgment to the judgment of those financially concerned.

■ Respecting the fairness of the plan, there is this to be said: The bondholders are conceded to have prior claims upon the assets of the debtor to those of stockholders. The main feature of the plan is that the bondholders give up their preferential rights to accept a common lot with stockholders. No one can say that this was unjust to stockholders. It might of course be that the share given the bondholders in the assets exceeded their fair share. This, however, is not asserted, and because of this we have not gone into it. The sole assertion of unfairness is that the plan gives an advantage to the common stockholders over the preferred. This turns not upon any legal principle, but a fact. The fact turns upon business judgment. Almost two-thirds of the preferred stockholders differ with the exceptants. The common stockholders unanimously proclaim their disagreement. More than one-half have certified to their judgment that the plan is fair to all, and the stockholders represented by the excepting common stockholders proclaim that the plan is unfair only and because only it is unduly favorable to the preferred shareholders. In view of this no court would be justified in condemning the plan as discriminating against preferred stockholders.

■ With the complaint that the debtor had used the preliminary report of the master to aid it in securing approval of the plan, we are in qualified sympathy. We do not agree with the proposition that there should be no reference to a special master until after the plan has been accepted by the required majority of creditors and stockholders concerned.

■ A very important aid to the court is to have the master conduct what is the equivalent of an election to determine the fact of acceptance or rejection of the plan. Whether a court, during the trial of a case or the conduct of any proceeding, should express any opinion which may have been formed is controlled by the sound discretion of the court. Masters have the like discretion.

■ We have no hesitation in stating our view that in a proceeding such as this the court should not express any opinion of a plan until after it had received the acceptance and approval of the interested parties and was regularly submitted to it for its required approval or disapproval. The learned master evidently thought it would contribute to an understanding of the plan

by the parties interested if he made a preliminary report upon it. He accordingly submitted such preliminary report. In accordance with the view we have taken, this report has remained on file without action thereon by the court, and without it being even called to the attention of the court, beyond the fact of its having been filed. As, however, it was filed and thus became a matter of record, we do not see that any one interested could be denied the right to make such use of it as he properly might.

### Exceptions of Common Stockholders.

We cheerfully accord to any stockholder, however small his holdings, all his legal rights. These include the right to object to a plan which has secured the approval of the majority. Equality and fairness are not determined by the brute force of numbers. Too often the rights of the small investor are disregarded and ignored because he is small, and, because small, of little or no importance. The mere fact that the exceptions are presented by the holder of a relatively small number of shares of common stock should not prejudice the objections urged to the plan. Expressed in percentage, the objecting shares are .002 per cent. of the total issue. The shares, although relatively few, have all the rights to a hearing which the many have. None the less, when out of a total issue of 1,105,560 shares only one stockholder, representing 2,300 shares, appears in opposition to a plan, the query naturally arises why the arguments which are advanced to persuade us have made no appeal to those most concerned.

The brunt of the argument is borne by the fact that the business prospects of the debtor have much improved over the situation existing when the petition was filed. Elaborate and very cleverly constructed charts have been prepared to forcibly impress this truth upon us. The main insistence of the objecting stockholder is that the plan should be referred again to the master to receive testimony in support of the fact of improvement in general business conditions. We see no need of this. The fact is one of which the court can take judicial notice. We accept the charts submitted as illustrative of this improved condition. It may well be that if the business conditions prevailing to-day had been present when the petition was filed, it would not have been filed. A creditor is a queer animal. Impress him with the thought that his debtor is amply solvent and easily able to pay the debt and he will urge the debtor to withhold payment. Let him suspect that the debtor is unable to pay, and he instantly and insistently demands payment, with consequences not only disastrous to his debtor, but often to himself. The situation which made it the part of wisdom to put the debt obligation of the debtor in manageable shape when the petition was filed may recur. If the debtor can be put on financial Easy Street it is well to do it and to do it when the "going is good."

As before remarked, the only objections which are urged to the plan are made by some of the preferred stockholders solely on the ground that it unduly favors the common stock and by one common stockholder that it favors the preferred stockholders to the prejudice of the common stock. They are largely outvoted by those whose interests are the same as their own, and the arguments of each may be left to be answered by the arguments of the other.

The plan has received the close and thorough study of the master, who has analyzed and discussed it so as to elicit praise from all interests. We have had pointed out to us no reasons for withholding our approval. The common stockholder exceptant failed to comply with our rules by not filing his exceptions with the master. The reasons for the requirement are obvious. The exceptions were, however, filed in compliance with the Equity Rules. We admit them to the record as filed in time.

The like right is extended to what we treat as the exceptions of Ross C. Patton, with this comment: We have already granted him leave to bring his action against the company.

A formal decree dismissing the exceptions to the master's report, confirming the same, and approving the plan of reorganization, may be submitted.