**In re LOS ANGELES LUMBER PRODUCTS CO., Limited.**

**No. 31352–RJ.**

District Court, S. D. California, Central Division.

July 18, 1938.

Faries & McDowell, David R. Faries, J. Clifford Argue, Gibson, Dunn & Crutcher, J. C. Macfarland, and Stuart Lapp, all of Los Angeles, Cal., for debtor.

Thomas K. Case, in pro. per.

George R. Larwill and Frank S. Balthis, Jr., both of Los Angeles, Cal., for bondholders Ogden et al.

William Schoenau, Jr., in pro. per.

Clarke & Bowker and Earl E. Moss, all of Los Angeles, Cal., for bondholder Adele M. Cowan.

Overton, Lyman & Plumb and C. L. McGaughey, all of Los Angeles, Cal., for bondholders Coulter and Priest.

JENNEY, District Judge (after stating the facts as above).

There are a number of interesting legal problems which have been presented orally and by briefs to the court.

The first issue to be considered is the constitutionality of Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, which has been questioned by counsel for the objectors, but which has never been passed upon directly by the Supreme Court of the United States. That court has however held constitutional Section 77, 11 U. S.C.A. § 205, relating to railroad reorganizations, which are in many respects similar to the corporate reorganizations intended to be covered by Section 77B. Continental Ill. National Bank & Trust Co. v. Chicago, R. I. & P. Ry. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110, 27 A.B.R.,N.S., 715.

While the Circuit Court of Appeals for this Ninth Circuit has not passed on the matter, the Circuit Courts of Appeal of the Second, Fourth, Seventh and Eighth Circuits have all held Section 77B to be constitutional. In re New Rochelle Coal & Lumber Co., 2 Cir., 77 F.2d 881, 29 A.B.R., N.S., 177; Campbell v. Alleghany Corp., 4 Cir., 75 F.2d 947, 27 A.B.R.,N.S., 504; In re Georgian Hotel Corp., 7 Cir., 82 F.2d 917, 31 A.B.R.,N.S., 234; Grand Boulevard Investment Co. v. Strauss, 8 Cir., 78 F.2d 180, 29 A.B.R.,N.S., 188.

No Circuit Court of Appeals, District Court, or state court, so far as any reported decision reveals, has held the section as a whole unconstitutional.

The decision in Tennessee Publishing Co. v. American National Bank, 6 Cir., 81 F.2d 463, 30 A.B.R.,N.S., 521, has been heavily relied upon by counsel for the objectors. It seems to this court to be distinguishable in principle. An analysis of that case shows that the lower court found the proceeding instituted in good faith, but declared subsection (b) (5) of Section 77B, 11 U.S.C.A. § 207 (b) (5), in so far as it purports to permit adjustment of liens without the consent of the lien holders, invalid under the Fifth Amendment to the Constitution, U.S.C.A.Const. Amend. 5.

That case was appealed, and the Circuit Court of Appeals found that the Plan of Reorganization which had been presented to the District Court, and which, of course, was a part of the record on appeal, was hopelessly unworkable. The appellate court said that it was apparent from the record that the company had had operating losses for such a length of time that it seemed impossible, under the plan presented, to turn those deficits into profits; that there was no reasonable prospect for the rehabilitation of the debtor. The appellate court, therefore, held that the plan was not filed in good faith, and was not a feasible one. The court admitted that because of its finding of lack of good faith, the question of the constitutionality of subsection (b) (5) was perhaps not necessary to be decided. It then went on to say that because other plans of reorganization might be presented to the court below after remand, it would nevertheless determine the constitutional question, rather than leave this subject open. It then sustained the decision of the lower court and held the provisions of subsection (b) (5) unconstitutional. It stated that under the Fifth Amendment to the Constitution, the lien holders had rights under their contract, to retain their lien, to public sale, and to have the mortgaged property devoted to the satisfaction of the debt, etc.

The decision of the Circuit Court of Appeals was affirmed by the Supreme Court in 299 U.S. 18, 57 S.Ct. 85, 81 L. Ed. 13, 32 A.B.R.,N.S., 180, on the ground that the plan was not feasible and not presented in good faith, but the court declined to pass upon the constitutional question.

In the opinion of this court, Section 77B of the Bankruptcy Act is constitutional. The question is whether or not the law authorizes the court to adjust the debts and obligations of an embarrassed corporate debtor, unable to pay its debts as they mature, without making a formal adjudication of bankruptcy or taking possession of its property for distribution among creditors, and whether that power may be sustained under the power over bankruptcies vested in Congress. U.S.C.A. Const. art. 1, § 8, cl. 4. The grant of power to Congress to establish uniform laws on the subject of bankruptcies does not seem to be limited to the forms in which that power has heretofore been exercised by Congress, or by the laws relating to

bankruptcies which have been passed in this country or in England or even in the several American Colonies prior to the adoption of the Constitution.[1]

■ All phases of the relationship between a financially embarrassed debtor and his creditors are brought under the control of Congress by the constitutional grant of power. The fact that a particular mode has heretofore been employed in dealing with this relationship should not, it seems to this court, be taken as a measure of the power of Congress to enact legislation in that regard. See Hanover National Bank v. Moyses, 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113; Sturges v. Crowninshield, 4 Wheat. 122, 4 L.Ed. 529; In re Landquist, 7 Cir., 70 F.2d 929; Nelson v. Carland, 1 How. 265, 11 L.Ed. 126; In re Reiman, 20 Fed.Cas. p. 490, No. 11,673, 7 Ben. 455.

■ In view of the statements contained in the opinion of the Supreme Court of the United States in the case of Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106, 28 A.B.R.,N.S., 397, respecting the power of the majority of a class to bind a minority in composition matters, it seems likely that the Supreme Court would hold Section 77B constitutional, if the question were squarely presented to it. In the absence of any such definite decision on the part of that court, it becomes the obligation of this court to do the best it can under the circumstances. That court would, we believe, hold that a lien, otherwise valid under Section 77B of the Act, could be impaired where the lien holder is a member of a class and the requisite two-thirds in amount of that class consent, and the plan of impairment is found by the court to be fair, equitable, feasible and not discriminatory. In that connection see: In re Central Funding Corp., 2 Cir., 75 F.2d 256, 27 A.B.R.,N.S., 764; Downtown Inv. Ass'n v. Boston Met. Bldgs., 1 Cir., 81 F.2d 314, 30 A.B.R.,N.S., 483, which, although not quite so directly in point, is a later case; Canada Southern Ry. Co. v. Gebhard, 109 U.S. 527, 3 S.Ct. 363, 27 L.Ed. 1020.

In Campbell v. Alleghany Corporation, supra, Judge Parker of the Fourth Circuit said in substance that it is no ground of constitutional objection to the Corporate Reorganization Amendment that the Act relates only to corporate debtors, as the uniformity required by the Constitution is geographical and not personal. He indicated that Section 77B, authorizing a court to readjust the debts and obligations of an embarrassed corporate debtor, without making formal adjudication of bankruptcy or taking possession of its property for distribution among creditors, is within the power over bankruptcies vested in Congress by the Constitution.

A statute requiring secured creditors of a corporation to scale down their debts. in accordance with the plan which two-thirds of them are willing to accept and which has been approved by the court as reasonable and fair, and accept in lieu of payment in money such securities as are specified in the plan, is not, he said, such an arbitrary and unreasonable exercise of the bankruptcy power as to amount to a denial of due process.

■ The fact that secured debts are affected by the Corporate Reorganization Amendment does not impair its constitutionality. Likewise, there is nothing relating to stockholders in that Amendment which affects its constitutionality, for like other constitutional grants of power, that giving Congress power over bankruptcies is to be interpreted, not in the light of the conditions with which the framers of the Constitution were familiar, but of what is required under modern conditions to deal adequately with the relationship existing between embarrassed debtors and their creditors.

■ The acceptance of a proposed plan by a large percentage of the parties interested is strong evidence that it is fair and feasible, and that it is made in good faith. While a court of equity will not allow minority bondholders to be disregarded or treated unfairly in a reorganization plan, yet, on the other hand, it will not lend its. aid to any scheme of minority bondholders opposing a fair reorganization plan solely as a means for obtaining greater value or more favorable terms for their bonds than are to be given by the plan to the great majority of the bondholders. Palmer v. Bankers' Trust Co., 8 Cir., 12 F.2d 747, 754; Downtown Inv. Ass'n v. Boston Met. Bldgs., supra.

---

[1] The court refers those who may be interested to articles appearing in 12 New York Univ. Quarterly Review 198, and 21 American Bar Association Journal 47.

In the latter case Judge Morris summed up the situation this way (81 F.2d page 323):

"Some of the tests applied by the Supreme Court in dealing with the question of whether a plan of reorganization is fair and equitable in equity receivership proceedings are that the plan must not exclude any creditor from participation under the penalty of the plan being declared a fraudulent conveyance and that it must not disregard the priority of any class of creditors. In the case of Kansas City Terminal Railway Co. v. Central Union Trust Company, 271 U.S. 445, 454, 46 S.Ct. 549, 551, 70 L.Ed. 1028, it was said with reference to a plan of reorganization:

"'But 'no such proceedings can be rightfully carried to consummation which recognize and preserve any interest in the stockholders, without also recognizing and preserving the interests, not merely of the mortgagee, but of every creditor of the corporation. In other words, if the bondholder wishes to foreclose and exclude inferior lienholders, or general unsecured creditors and stockholders, he may do so; but a foreclosure which attempts to preserve any interest or right of the mortgagor in the property after the sale must necessarily secure and preserve the prior rights of general creditors thereof. This is based upon the familiar rule that the stockholders' interest in the property is subordinate to the rights of creditors, first of secured and then of unsecured creditors. And any arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights of either class of creditors comes within judicial denunciation." Louisville Trust Co. v. Louisville Railway Co., 174 U.S. 674, 683, 19 S.Ct. 827, 830, 43 L.Ed. 1130.'

"From this it would seem that no plan is fair and equitable that does not recognize the prior rights of creditors. See, also, First National Bank v. Flershem, 290 U.S. 504, 54 S.Ct. 298, 78 L.Ed. 465, 90 A.L.R. 391.

"One of the impelling reasons for the passage of 77B by the Congress was to provide a simpler method for the reorganization of corporations laboring under financial embarrassment due to overcapitalization and excessive fixed charges resulting from easy credit and excessive expansion of more prosperous days. It was necessary to devise a law to prevent unreasonable minorities from blocking fair and equitable plans of reorganization which they could do prior to the passage of 77B."

All of us know from sad experience that one or two recalcitrant bondholders were able, under the old methods, to hold up very definitely beneficial plans until they were paid off 100 cents on the dollar. Continuing, Judge Morris said:

"In order to accomplish the desired purpose Congress turned to the principles of the Bankruptcy Act passed in 1898. This had stood the test of constitutionality. And as we view it, 77B is but an extension of the doctrine of composition provided in section 12 of the original Bankruptcy Act [11 U.S.C.A. § 30].

"Reorganization plans under 77B may differ from offers in composition in form and complexity, but the difference is little more than one of degree. A plan of reorganization when accepted is nothing more than an agreement between the debtor and its creditors and stockholders, or if the debtor has been declared insolvent, then between the several classes of creditors. When such contract or agreement has been accepted by the requisite majority of creditors and stockholders, the principle long recognized in composition cases steps in and under the supervision of the court imposes upon objecting minorities the will of the majority. This could not be accomplished under the acid tests applied to equity receiverships before the passage of 77B.

"We therefore hold that section 77B does not require that every plan approved as fair and equitable shall be of such a character that it would withstand attack by nonassenting creditors asserting their strict legal rights unaffected by any principles of the Bankruptcy Act.

"To hold that the phrase 'fair and equitable' has the same meaning when applied to a reorganization under 77B as it had in equity receiverships, is to eliminate from it to a certain degree the rights of creditors and stockholders to adjust their respective rights by contract and nullify provisions of the act which was passed to facilitate corporate reorganizations."

Let us then consider the other main points raised by those objecting to the plan.

The first point is this: Under the modified plan, bondholders, without the consent of all of them, would be deprived of certain substantial rights, such as, the right to foreclose their mortgage or Trust Indenture, to

510

have a judicial sale of the mortgaged or hypothecated property under the direction of the court, to bid at that sale on the security under the Trust Indenture, the right to enforce stockholders' liability on a deficiency claim against present stockholders of the debtor corporation, and so forth.

As to stockholders' liability. Present objectors and all nonassenting bondholders,—who, combined, apparently hold less than seven and one-half per cent of outstanding bonds—once might have had the right to sue stockholders upon California's previous statutory stockholders' liability. However, nearly all of the bondholders some time ago expressly waived this liability; and, in any event, under the terms of Article IX, Section 2 of the Trust Indenture and proper proceedings taken thereunder, stockholders' liability was waived on behalf of all bondholders against most of the stockholders. Objectors insist that this waiver is invalid as to them because they did not expressly consent thereto. But the owners of more than three-fourths in amount of all outstanding bonds did so consent—strictly in accordance with the requirements of the Trust Indenture for amendment; and, as will be seen later, this Court believes that such a provision for amendment of the Trust Indenture is valid and binding.

It should be noted that, even if there had been a judicial sale under foreclosure and a deficiency judgment, the bondholders would not thereby have had any claim against stockholders which could be enforced in this proceeding. The bondholders would still be subject to Section 4 of the Bankruptcy Act, 11 U.S.C.A. § 22, which does not give this court power to determine any issue of stockholders' liability not passing to the trustee in bankruptcy.

As hereinbefore indicated, if there were only one lien holder, or bondholder, the contention of the objectors to the plan,—that the secured debt could not be scaled down without the consent of that one bondholder,—would be supported by authority, viz.: Louisville Joint Stock Land Bank v. Radford, supra; Security-First National Bank of Los Angeles v. Rindge Land & Navigation Company, 9 Cir., 85 F.2d 557, 107 A.L.R. 1240, 32 A.B.R., N.S., 97; Tennessee Publishing Co. v. American National Bank, supra; Horn v. Ross Island Sand & Gravel Com-

pany, 9 Cir., 88 F.2d 64, 33 A.B.R., N.S., 463; In re 333 North Michigan Avenue Bldg. Corp., 7 Cir., 84 F.2d 936, 31 A.B.R., N.S., 639. But, as pointed out in the Radford Case, a different principle applies where, as in the case at bar, there is a class of lien holders, and where the objectors are only two out of many lien holders of the same class. In such a situation, there may be a scaling down of the secured debt by way of reduction of interest, reduction of principal, extension of the maturity date, or any other of several devices, provided two-thirds, in amount, of the class consent, and provided further that the plan is fair, equitable, feasible and not discriminatory as to any member of the particular class. The case of Horn v. Ross Island Sand & Gravel Company, supra, is not authority against this proposition. Our own Circuit Court of Appeals indicated clearly that in that particular case there was no such consideration passing from the stockholders to the enterprise, as would have made the final plan a proper one under the law. The case is therefore easily distinguishable.

The second point of objectors is that no stock in the reorganized corporation can be given stockholders upon any basis at all, since the debtor corporation is insolvent. Objectors rely upon expressions, appearing in a number of cases, to the effect that creditors must first be made "whole". In the case of In re New York Railways Corp., 82 F.2d 739, 30 A.B.R., N.S., 748, Judge Manton, in the Second Circuit, said (page 744): "The courts will scrutinize with care all plans of reorganization proposed for insolvent companies to make certain that assets belonging to creditors are not by indirection being diverted to stockholders, but it is obvious here that no such purpose is shown. Stock equity may not be allowed to participate in any plan of reorganization which does not first provide for making creditors whole."

Just what that expression means is not clear. Does it imply payment of the principal and accrued and unpaid interest in full,—in cash immediately on the line? Or does it mean something less than that? Counsel for the objectors has suggested that it means giving the creditors "complete compensation", and it may be that Judge Manton actually meant, by the word "whole", "properly or fairly

compensated". That was the meaning expressed in Northern Pacific Ry. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L. Ed. 931. It is probably more nearly a correct indication, and that terminology has been followed by many courts. It is true, as suggested by counsel, that creditor lien holders must be fairly compensated before old stockholders may be let into the picture; for which point the Rindge Case, supra, is authority. However, the District Court does have wide discretion in determining whether or no there has been fair compensation provided under the plan. In re Georgian Hotel Corp., supra.

In the reorganization of weak enterprises, where it is desirable to clear away all bonded indebtedness so as to facilitate the raising of new capital, shares of stock certainly may be issued for all outstanding bonds. That has been done many times. In such cases it is usual to wipe out the interests of the old stockholders, or to scale down their holdings drastically, or even to compel them to pay an assessment in order to retain any interest in the project. Gerdes on Corp. Reorganizations, p. 1643, Sec. 1026; Ginty v. Ocean Shore Ry. Co., 172 Cal. 31, 45, 155 P. 77; In re Caffall Oil Corp., D.C. La., 22 F.Supp. 484. While a fair plan must give due recognition to the interests of all classes of creditors and stockholders, this does not mean that recognition may only be given by cash payments, in part or in full. Gerdes on Corp. Reorganization, p. 1741, Sec. 1086.

As pointed out by the Supreme Court in the case of Kansas City Terminal Ry. Co. v. Central Union Trust Co., 271 U.S. 445, at page 454, 46 S.Ct. 549, at page 551, 70 L.Ed. 1028, in discussing the effect of the Boyd Case,

" * * * This does not require the impossible and make it necessary always to pay unsecured creditors in cash before stockholders may retain any interest whatever in the reorganized company. By way of illustration it [the Supreme Court in the Boyd Case] further pointed out that such creditors can be protected 'by the issuance, on equitable terms, of income bonds or preferred stock.' And we now add that, when necessary, they may be protected through other arrangements, which distinctly recognize their equitable right to be preferred to stockholders against the full value of all property belonging to the debtor corporation, and afford each of them fair opportunity, measured by the existing circumstances, to avail himself of this right."

The District Court must scrutinize reorganization plans of insolvent companies in order to be sure that assets belonging to creditors are not by indirection diverted to stockholders (In re Day & Meyer, 2 Cir., 93 F.2d 657, 35 A.B.R., N. S., 440; Price v. Spokane Silver & Lead Co., 8 Cir., 97 F.2d 237), or to the debtor corporation itself (Horn v. Ross Island Sand & Gravel Co., supra). We do not feel however that this means that old stockholders cannot be provided for in the reorganization, where they do furnish to the creditors compensating advantages.

In the case of In re Day & Meyer, just alluded to, one of the latest cases on the subject, it appeared that there was in the property a substantial equity over the bonded indebtedness. The plan however provided that the bonds be reduced to one-half their principal amount; that past due interest thereon be eliminated, and that the equity created by such scaling down be represented by the issuance of new preferred and common stock to be shared by bondholders with general creditors, old stockholders and existing management. The appellate court disapproved this plan because it did not preserve priorities and deprived bondholders of their lien without any compensating advantages.

In the case of Horn v. Ross Island Sand & Gravel Co., supra, it appeared that the bonded indebtedness covered five parcels of property, three of which were land, the fourth buildings and equipment upon the lands, and the fifth, shares of stock in two corporations. It also appeared that the shares of stock of one of the corporations were turned into cash during the proceeding. The Plan of Reorganization provided for the distribution among the bondholders, on a pro rata basis, of the cash thus realized from the sale of stock, but that all the other items of property were to be turned back to the debtor, free of the bond lien. While the plan was actually approved by the requisite majorities of bondholders, unsecured creditors and stockholders, the appellate court held that there were no compensating advantages at all furnished by the debtor to the bondholders. The court expressly found that there was no consideration passing. It did not even say that

it was not adequate. It rejected the plan, and pointed out (88 F.2d page 65): "In Security-First National Bank of Los Angeles v. Rindge Land & Navigation Co., [9 Cir.] 85 F.2d 557, 561 [107 A.L.R. 1240, 32 A.B.R., N.S., 97, 104], we said: 'There is nothing in section 77B which authorizes a debtor to pay a secured creditor less than half the amount of the debt while retaining to its own use a portion of the property securing the debt. The right to retain a lien until the debt secured thereby is paid is a substantive property right which may not be taken from the creditor consistently with the Fifth and Fourteenth Amendments to the Constitution [U.S.C.A. Const. Amends. 5, 14].'"

Our Circuit Court of Appeals also referred to the decision of the Seventh Circuit, In re 333 North Michigan Avenue Bldg. Corp., supra, where Judge Sparks had said (84 F.2d page 940): "Under section 77B, the rights of all claimants and creditors are entitled to the same protection, but they may be divided into classes, as was done in this proceeding. That law requires a two-thirds vote of each class before a plan can be confirmed, and that provision was complied with in the case before us. When a class consists of only one party, regardless of the nature of his claim, his consent must be obtained, provided his claim is affected by the plan. If, however, he is one of a class, and two-thirds of that class approve a plan which the court finds fair, equitable, feasible and not unfairly discriminatory in favor of any class, and all classes have so consented, the remaining members of that class or classes will be bound by the plan, although their rights may be changed," citing Continental Illinois, etc., Co. v. Chicago, R. I. & P. Ry. Co., supra, Louisville Joint Stock Land Bank v. Radford, supra, and Cumberland Glass Manufacturing Company v. De Witt, 237 U.S. 447, 35 S.Ct. 636, 59 L.Ed. 1042, 34 A.B.R. 723.

Summing up the law on this point, Judge Augustus N. Hand stated, in the case of In re Barclay Park Corp., 2 Cir., 90 F.2d 595, 598, 34 A.B.R., N.S., 209: "To justify a retention of a stock interest by the present shareholders it should appear that they have furnished an additional consideration or have an equity in the estate of the debtor after the rights of the creditors are fully provided for in some way."

The court has a wide discretion with respect to allowing stockholders to participate in the plan, even though the debtor is insolvent. In re Georgian Hotel Corp., supra; In re Baldwin Locomotive Works, D.C.Pa.1937, 21 F.Supp. 94, 32 A.B.R.,N.S., 669; In re Burns Bros., D.C., 14 F.Supp. 910, 35 A.B.R.,N.S., 714; In re A. C. Hotel Co., 7 Cir., 93 F.2d 841, 35 A.B.R.,N.S., 555.

In the Burns Case the debtor was insolvent but there were counterclaims, substantial but controverted, asserted by the debtor against creditors holding ninety-five per cent of the unsecured claims. A reorganization plan by which the claims of these creditors were subordinated to the claims of other creditors was held fair, the plan having been approved by a large majority of each class of creditors and stockholders. The court went on to say (page 913): "On the foregoing facts, it is evident that the present plan and the two motions incident to it represent an effort to compromise controversies among creditors and stockholders of the debtor and to relieve the debtor of its financial embarrassments by a prompt reorganization."

Judge Evans, in the A. C. Hotel Co. Case, supra, likewise pointed out (page 843): "The expressed preference of a large percentage of all classes of security holders interested in the property, especially if well considered and apparently intelligently reached, should not be lightly set aside. Proceedings under section 77B are for the benefit of security holders, particularly the creditors, if the debtor be insolvent. It is their property rights that are at stake. In ventures where large sums of money are borrowed and bonds are sold to the public there is difficulty in getting united, intelligent action on the part of widely scattered bondholders, many of whom are holders of but a few bonds. The Bankruptcy Law was amended to meet such a situation and to permit of effective action where two-thirds of the creditors of each class of claims favor it."

This point settled by sound authority, we come naturally to an examination of what consideration, other than cash, the Class A stockholders in the case at bar propose to give up or surrender, or have already given up, as a justification for the issuance of stock to them under the plan, and what benefits the bondholders will derive under that plan. The following factors have been urged as being pertinent:

(1) At the time of the 1930 reorganization the book assets were worth only about $400,000, and, if the bonds had been fore-closed at that time, that is all the bondhold-ers would have received. They would have taken that sum and stepped out of the picture, recovering thereby only a small part of their original investment. At that time those stockholders who are now given consideration in the plan of reorganization, advanced $400,000 in cash upon the agreement that foreclosure proceedings under the Trust Indenture would not be initiated by bondholders unless interest was earned and not paid.

(2) The old stockholders are the only persons who are familiar with the company's operations and who have had experience in shipbuilding. Their accumulated experience is of value to the reorganized company. Among their number are individuals who not only have been active in past management but who now have business contacts which will be of value of the re-organized company, these contacts being with financial institutions and with oil companies who now constitute the debtor's principal customers. They have expressed a willingness to assume managerial responsibility.

(3) Most of the present bondholders are widely scattered with small holdings, and their position would be benefited by being associated with old stockholders of financial influence and stability who might be able to assist in proper financing.

(4) If the plan of reorganization is not confirmed, bondholders will have to wait, in all probability, until 1944, in order to realize upon their security. If the bond-holders, through this 77B proceeding, attempt to eliminate the stockholders, the latter may make strenuous objection upon the theory that, unless they are given some consideration, the proceedings are tanta-mount to a foreclosure, and therefore violate the previous agreement so deferring foreclosure. This might easily result in litigation which would not only be expensive but which might delay matters so that present opportunities would be lost. In waiving their right to defer any possible foreclosure, these stockholders who are given consideration under the plan are clearly parting with a valuable asset. We are not in sympathy with objectors' contention that the agreement to defer foreclosure was illegal and ineffectual.

As previously stated, this deferment of foreclosure was accomplished through compliance with the provisions of Article IX, Section 2 of the Trust Indenture, which provided, in effect, that three-fourths in amount of bonds could bind all the bonds in perfecting an amendment, even to the extent of impairing the lien. In the opinion of this court, such a provision is valid, provided, of course, the modification is fair and equitable. Here it will be noted the bonds themselves contain on their face a reference to the terms of the Trust Indenture and the right to amend contained therein. Sneath v. The Valley Gold, Ltd., 68 Law T., N.S., 602; In re Georgian Hotel Corp., supra; In re British Columbia Portland Cement Co., 22 Dominion Law Reports 609, affirmed by the British Columbia Circuit Court of Appeals, 1916, 27 Dominion Law Reports 726; Dolph v. Cincinnati, B. & C. R. Co., 1913, 56 Ind.App. 137, 103 N. E. 13; Mercantile Inv. & Gen. Trust Co. v. International Company of New Mexico, 7 Times L.Rep. 616; British American Nickel Corp., Ltd., v. O'Brien, [1927] A.C. 369.

If the proposed plan is not confirmed, and the present proceedings dismissed, the bondholders will be in a quandary. They cannot foreclose before 1944 without litigation, which promises to be long and expensive. In the meantime, the company may die of dry rot, because of its inability to take advantage of current opportunities and to participate in the expected revival of ship construction. Even if the contesting bond-holders could have declared illegal the agreement deferring foreclosure until 1944, they would still be faced with that provision in the Trust Indenture which requires the consent or direction of twenty-five per cent, in amount, of bonds outstanding before a sale by the trustees may take place. Naturally, it would be impossible to get the consent of twenty-five per cent of those holding bonds because more than seventy-five per cent are definitely opposed to such a procedure and have so declared themselves.

All the bondholders who are in favor of some fair and equitable plan of reorganization seem to agree that the division of stock in the reorganized corporation, between bondholders and old Class A stockholders, is proper upon the basis of seventy-seven and twenty-three per cent. respectively. The only objectors, apparently, are the dissenting bondholders,—holding $18,-500 face value of bonds,—who want to be

paid off in full, and who are opposed to bondholders who deposited under the 1930 reorganization and stockholders getting anything until they are so paid. There does not seem to be any difference of opinion among those bondholders who believe the stockholders should have participation. If they are to participate at all, the indicated percentages are satisfactory. Whether or not this court might feel that the stockholders' participation is too large, too small, or just right, is not now important. After all, that matter has been pretty well threshed out by all the interested parties over a period of many months. Apparently all but a comparatively few bondholders have expressly conceded, and the special master has held, that there is now an equitable and fair division proposed. This court's problem therefore is simply this: May the old stockholders be allowed anything?

■ In the case of In re Baldwin Locomotive Works, supra, the court held that while the creditors have a prior right to payment of their claims before stockholders get anything, still, on the question of whether a reorganization plan may be wise or foolish, the court, in its exercise of its power of approval, should defer to the business judgment of those whose financial interests are at stake. This court is in accord with that statement.

■ It is next contended by objectors that the plan of reorganization should be disregarded and a liquidation had under subdivision (k) of Section 77B, 11 U.S.C.A. § 207(k), after the entry of an order of liquidation. It is doubtful whether this court has power to liquidate the assets covered by the Trust Indenture, either under subdivision (k) or in a separate bankruptcy proceeding, since there is clearly no equity in the property above the amount due on the bonds. The decisions are not entirely clear, but the principal seems sound, and judges are properly loath to provide for such a liquidation without the consent of one hundred per cent. of the lien creditors. The sale, of course, would have to be "free of liens",—i. e., the bondholders' lien would have to be wiped out and their interests satisfied out of the proceeds of sale. While the bankruptcy court has power to sell, free and clear of liens, Van Huffel v. Harkelrode, 284 U.S. 225, 52 S.Ct. 115, 76 L.Ed. 256, 78 A.L.R. 453, 18 A.B.R.,N.S., 730, it seems to be settled that such a sale will not ordinarily be ordered where the amount of the incumbrance exceeds the value of the property as found by the court. After all, the question of whether or no such a sale, free and clear of liens, should be ordered, is, also, one for the sound discretion of the court, in the light of all the circumstances. Central States Life Ins. Co. v. Koplar Co., 8 Cir., 80 F.2d 754, 30 A.B.R.,N.S., 236; Federal Land Bank of Baltimore v. Kurtz, 4 Cir., 70 F.2d 46, 25 A.B.R.,N.S., 63. See, also, In re Miller, 7 Cir., 95 F.2d 441, 36 A.B.R.,N.S., 361. That discretion will ordinarily not be exercised unless all lien holders have consented, or have not objected after having been given reasonable opportunity so to do. Horn v. Ross Island Sand & Gravel Co., supra; In re Zehner, D.C., 193 F. 787, 27 A.B.R. 536.

The Ninth Circuit decisions in Security-First National Bank v. Rindge Land, etc., Co., supra, and in Francisco Bldg. Corp. v. Battson, 83 F.2d 93, 31 A.B.R.,N.S., 180, are distinguishable in that these cases deal with instances under subdivision (b)(5) of Section 77B. There less than two-thirds in amount consented to the plan and our Circuit Court of Appeals has held that, in that event the protection afforded to non-assentors must be completely compensatory. In the case at bar, considerably more than two-thirds have expressly consented; and only $18,500 in face amount out of $2,565,500 outstanding have actually objected. It has naturally been found impossible to communicate with many of the other bondholders.

A brief examination of some of the cases cited by counsel for the objectors (In re Day & Meyer, supra, and Preble Corp. v. Wentworth, 1 Cir., 84 F.2d 73, 31 A.B.R.,N.S., 453) will reveal that these cases are also distinguishable, in that, in the case at bar, stockholders are giving up substantial and valuable rights in exchange for their common stock, and are providing a continuity of experienced management. See In re Barclay Park Corp., supra. The case of Texas Hotel Securities Corp. v. Waco Development Co., 5 Cir., 87 F.2d 395, 32 A.B.R.,N.S., 335, may also be distinguished because here we have the consent of some ninety-two-odd per cent. of the class which is being affected. In Wayne United Gas Co. v. Owens-Ill. Glass Co., 4 Cir., 91 F.2d 827, 34 A.B.R.,N.S., 262, the proposed plan gave stockholders control, while in the case at bar bondholders have a very substantial control through the division of

seventy-seven as against twenty-three per cent.

· There seems to be nothing in the case of In re New York Railways Corp., 2 Cir., 82 F.2d 739, 30 A.B.R.,N.S., 748, or in Northern Pacific Ry. Co. v. Boyd, 228 U. S. 482, 33 S.Ct. 554, 57 L.Ed. 931, which in theory interferes with the adoption of the plan here proposed. The former bondholders are here given each year a preference in dividends and are at all times preferred up to the par value of their shares upon liquidation; which is, of course, a most substantial right. Under it the common stockholders will receive nothing, if there is a liquidation in the near future, until the preferred stockholders have received the par value of their stock.

There are other points raised by counsel for the objectors, such as—that the plan is not fair and equitable in that it removes the lien of the bonds and gives bondholders merely a stock interest in the enterprise; that it does not make any allowance for unpaid interest; and that it is based upon an inadequate appraisal, in that it does not take into consideration the very valuable Harbor Lease.

 We do not deem it material how the bondholders' claim arises; whether from failure to pay principal or interest, or both. The aggregate is what we are interested in. Nor do we feel that the loss of the lien is fatal. Under the modified plan, since the bondholders are given a very substantial majority of the new stock, they at all times will control the new corporation by having the legal capacity to elect a majority of the board, and may even liquidate the corporation. Actually the bondholders are being given practically everything they could get after they had gone through the trouble, expense and delay incident to foreclosure—even if a foreclosure could be had in spite of the moratorium agreement. The exception is this: They are possibly foregoing a 23/100ths interest in the business in consideration of an immediate reorganization. We say "possibly" because of the preference given to preferred stockholders upon liquidation, which may give them all the assets instead of 77/100ths thereof. Bondholders apparently believe that a bird in the hand is worth two in the bush; that a seventy-seven per cent. preferential interest in the profits of a growing business may pull them out entirely, and that an immediate forced liquidation might bring them very little return. The court does not regard the Harbor Lease as of any value, unless some way is provided to make debtor a going concern; otherwise, there is no way to realize any substantial value from that lease. There is no evidence that the lessors would be willing to pay a bonus to be released from it, or that the lessee can get any advantage from transferring it. The court accordingly finds, as a matter of fact, that except to a going concern, the lease has no substantial value.

 It is also argued by objectors that, by reason of the deposit of bonds in 1930, depositing bondholders lost their liens because the deposit agreement transferred all right, title and interest in the bonds to the bondholders' committee. A reading of the deposit agreement convinces the court that the deposit and transfer of title was for a special purpose, that the bondholders retained equitable rights therein including the right to a return of the bonds when the purpose of the deposit was complied with. By that process there could have been no merger of title in the company, as claimed, which would have tended to destroy the lien of the bondholders against the property.

 It is likewise urged that the provisions of the original Trust Indenture, if literally interpreted, preclude debtor corporation from taking advantage of Section 77B as against the bondholders or, at least, as against objecting bondholders. This argument rests on the theory that if the moratorium against foreclosure prevented the bondholders from foreclosing through a trustee's sale or by a judicial sale, it also precluded any possible liquidation under the provisions of Subdivision (k) of Section 77B of the Bankruptcy Act. · It seems to the court extremely doubtful that in any event such a limitation could ·be made to apply to involuntary proceedings under Section 77B, commenced by creditors against the debtor as provided in subdivision (a) of that section, 11 U.S.C.A. § 207(a); and any such attempted restriction upon the debtors' rights even in a voluntary proceeding would seem to this court to be void, as contrary to public · policy. The court does not believe that the company could place itself, or that the bondholders did place themselves by this agreement which is binding upon all parties, in such a position that advantage could not be taken of this section of the

516

Bankruptcy Act. In that connection see: In re Weitzen, D.C., 3 F.Supp. 698, 23 A. B.R.,N.S., 653; Federal National Bank v. Koppel, 253 Mass. 157, 148 N.E. 379, 40 A.L.R. 1443, 6 A.B.R.,N.S., 287.

It has been held in a number of cases that a state or federal court appointing an equity receiver for a corporation cannot lawfully restrain its officers from invoking bankruptcy or consenting thereto. This principle seems sound and analogous. Struthers Furnace Co. v. Grant, 6 Cir., 30 F.2d 576, 13 A.B.R.,N.S., 537; In re American & British Mfg. Corp., D.C., 300 F. 839, 4 A.B.R.,N.S., 1041.

The court finds that the plan now proposed by debtor herein has been duly and properly presented, considered and approved by more than the required amount of each class of creditors and stockholders, strictly in accordance with the provisions of Section 77B of the Bankruptcy Act, and that no other plan for the reorganization of debtor, or any amendment to said plan or modification thereof, except as herein expressly indicated has been proposed; that all proper notices have been given to all interested parties, as required by law; that all proceedings taken by debtor in connection herewith and by its Board of Directors, officers, attorneys and agents in the preparation and submission of said plan and for its approval and confirmation have been done in good faith; that the plan is fair and equitable and does not discriminate unfairly in favor of any class of creditors or stockholders of the debtor, and is feasible; that the plan complies with the provisions of Subdivision (b) of Section 77B, 11 U.S.C.A. § 207(b), and all other applicable provisions of Section 77B; that the plan has been accepted, as required by the provisions of Subdivision (e), Clause 1 of Section 77B, 11 U.S.C.A. § 207 (e) (1), and all other applicable provisions of said Section 77B; and that the offer of the plan and its acceptance are in good faith and have not been made or secured by any means or promises forbidden by the Bankruptcy Act.

The court hereby expressly rejects and overrules all objections to the plan of reorganization and objections to the order of this court classifying creditors and stockholders of debtor into classes, according to the nature of their respective claims and interests, and objections to the jurisdiction of the court and exceptions to the Special Master's report.

The court expressly reserves jurisdiction of these proceedings to make such further orders and to take such further action in connection therewith as to the court may seem meet.

Exceptions are allowed to all rulings of the court.

Counsel for the debtor is directed to prepare findings of fact and conclusions of law and a form of decree, which will embody, in as far as the same are necessary, the statements of the court made here today. The form of order will then be submitted to all interested counsel, to the Master, and to the court for final approval.

It is so ordered.